ETTA TROUT, Adm'rx of the Estate of Gilbert Trout, Plaintiff-Appellant, *v.* BANK OF BELLEVILLE, Defendant-Appellee.

Fifth District No. 75-335

Opinion filed February 18, 1976.

David C. Wahl, of Wiseman, Shaikewitz, McGivern & Wahl, of Alton, for appellant.

Walker & Williams, P.C., of Belleville (David B. Stutsman, of counsel), for appellee.

Mr. JUSTICE JONES delivered the opinion of the court:

Plaintiff, Etta Trout, as administratrix of the estate of her deceased son, Gilbert Trout, brought an action against defendant, Bank of Belleville, for the wrongful death of Gilbert Trout. Plaintiff's complaint was in two counts. The first count alleged, among other things, that Gilbert Trout had been a customer of defendant and that while he was exercising ordinary care, his death resulted from the negligent acts or omissions of defendant. The second count contained substantially the same allegations, with the exception that defendant's acts or omissions were alleged to be willful and wanton rather than merely negligent.

The case was brought to trial before a jury. At the close of plaintiff's case defendant moved for a directed verdict on both counts. The court granted the motion with respect to both counts and entered judgment against plaintiff. Plaintiff appeals, raising only the issue whether the court erred by directing a verdict for defendant on both counts of plaintiff's complaint.

Subsequent to her filing of the notice of appeal, plaintiff filed in this court a motion to amend the second count of her complaint to include the allegation that Gilbert Trout "was free from contributory willful and wanton conduct," and "[a]lternatively" that he was a trespasser. Plaintiff's motion was allowed.

Gilbert Trout's death occurred when he ran into a chain which was strung across the parking lot of defendant bank. The circumstances in which this occurred were described by two witnesses for plaintiff, Richard Klein and Michael Dome, during their testimony at the trial. At approximately 2 a.m., October 29, 1971, Trout, Klein and Dome were

riding together, each on a separate motorcycle, in an easterly direction on West Main Street in Belleville, Illinois. Over a period of two or three months prior to that time, Trout, Klein, and Dome had become accustomed to riding their motorcycles together each Thursday night. On this particular occasion, they had ridden on some rural roads near Caseyville, Illinois and then returned to Belleville, where each of them lived. While en route home, they discussed the possibility of stopping for something to eat at a Belleville restaurant. Klein decided to return to his home. The other two decided that they would go to a restaurant but that they would first ride along with Klein to his home.

The Bank of Belleville is located at 48th and West Main streets in Belleville. Along side the bank is a parking lot and "drive-up" teller windows. On the northern side of the lot is West Main Street; on the opposite side is Washington Street. Apparently, although it is not totally clear from the testimony or trial exhibits, there were driveways on both the West Main Street side and the Washington Street side of the lot. Along the western side of the bank lot, but separated from it by a curb, is a driveway or alleyway, on the opposite side of which is a flower shop.

As the three motorcycle riders approached this portion of West Main Street, Trout and Klein were close together; Dome was approximately 150 feet behind them. Taking a "shortcut," Klein turned into the alleyway and Trout turned into the bank lot. Klein anticipated that Trout would have to exit from the lot in the same way that he had entered, because Klein was aware of the chain across the bank lot. However, as Klein neared Washington Street he heard a crash. He proceeded to Washington Street, drove into the bank lot and discovered Trout lying on the pavement and his motorcycle on its side on the pavement.

When Dome reached the bank lot, he turned into the bank lot and waited. Dome anticipated that Trout would come out of the lot the same way he had entered it because Dome was also aware of the chain stretched across the bank lot. When Trout did not come out, Dome drove further onto the lot to see what had occurred. He also found Trout and the motorcycle lying on the pavement.

The chain into which Trout had driven ran parallel to West Main Street and Washington Street at a distance of approximately 175 feet from West Main Street. The chain was approximately 70 feet long and was a dark color much the same as the color of the parking lot pavement. The chain was strung from a post on one end, through a series of three standards spaced at equal intervals across the lot, and to a post on the other end, thus making a total of four spans. The distance of the chain from the pavement was approximately 30 to 36 inches. On each of the three standards was a "no thoroughfare" sign. Two stop-

signs had been rung on the chain, one on the easternmost span and one on the next span. However, no stopsign had been hung on the other two spans. (Defendant had driven into the westernmost span.) According to Dome, one driving through the lot on the same route that Trout had taken would not be able to see the stopsigns unless that person looked to his left.

At 2 a.m. on October 29, 1971, the weather was clear. The bank lot was well lit by a number of mercury vapor lights; however, near the westernmost portion of the chain was a tree which partially shaded that area from the lights.

According to Klein, during the 1-year period prior to October 29, 1971, he had driven his motorcycle approximately ten times at night through the bank lot from West Main Street to Washington Street. For 8 to 12 months he had known that the chain was up "once in a while" at night in the bank lot. Because of this knowledge, he had cut through the alleyway rather than through the bank lot on this particular occasion. Klein and Trout had never ridden through the bank lot together at night, although they had ridden through together once during the day.

According to the testimony of Dome, he had never driven through the bank lot before, and he did not know whether Trout had ever driven through the lot. Dome had known for at least a year prior to October 29, 1971, that the chain was used in the bank lot, because on one occasion he had begun to drive through the lot and had found the chain to block the way. Because of his knowledge that the chain was used, Dome waited for Trout to exit from the lot at the same place Trout had entered.

■■ Under Illinois law the duty of a landowner with respect to a person who comes upon the premises varies according to the status of the person. (*Gartley v. Chicago Housing Authority*, 28 Ill. App. 3d 705, 329 N.E.2d 252; 28 Ill. L. & Pr. *Negligence* §§51, 56, and 60 (1957).) It has long been settled that a landowner has a duty to exercise reasonable care for the safety of an invitee. (*Pauckner v. Wakem*, 231 Ill. 276, 83 N.E. 202, 14 L.R.A. 1118; *Milauskis v. Terminal R.R. Association*, 286 Ill. 547, 122 N.E. 78.) To a trespasser, however, the landowner owes only the duty not to willfully and wantonly injure him and to use ordinary care to avoid injuring him after he is discovered in a place of danger. (*Briney v. Illinois Central R.R. Co.*, 401 Ill. 181, 81 N.E.2d 866.) The owner's duty to a licensee is the same as his duty to a trespasser (*Pauckner v. Wakem; Jones v. 20 North Wacker Drive Building Corp.*, 332 Ill. App. 382, 75 N.E.2d 400); the licensee will be able to recover only by showing an injury willfully and wantonly inflicted.

*Pauckner v. Wakem; Schoen v. Harris,* 108 Ill. App. 2d 186, 246 N.E.2d 849.

■■■ An invitee is a person who goes upon the premises of another by an express or implied invitation to transact business in which he and the owner have a mutual interest or to promote some real or fancied material, financial, or economic interest of the owner. (*Madrazo v. Michaels,* 1 Ill. App. 3d 583, 274 N.E.2d 635; IPI Civil No. 120.05, at 356 (2d ed. 1971).) A licensee is a person who goes upon the premises of another with the express or implied consent of the owner, to satisfy his own purposes rather than for the mutual benefit of himself and the owner or a purpose connected with the business in which the owner is engaged or permits to be carried on upon the premises. (*Drews v. Mason,* 29 Ill. App. 2d 269, 172 N.E.2d 383; *Kapka v. Urbaszewski,* 47 Ill. App. 2d 321, 198 N.E.2d 569; *Schoen v. Harris;* IPI Civil No. 120.08, at 361 (2d ed. 1971).) A trespasser is one who enters the premises of the other without permission, invitation, or other right, and intrudes for some purpose of his own, or at his convenience, or merely as an idler. 62 Am. Jur. 2d *Premises Liability* §55, at 297 (1972); IPI Civil No. 120.01, at 349 (2d ed. 1971).

Habitual acquiescence in a trespass may well constitute a license for persons to go upon the land if the tolerance is so pronounced as to be tantamount to permission. (62 Am. Jur. 2d *Premises Liability* §51, at 292 (1972).) However, even in cases of habitual acquiescence by the landowner, a person on the premises because of such tolerance who is injured thereon will not be able to recover by showing mere negligence on the part of the landowner, but only by showing willful and wanton conduct. *Illinois Central R.R. Co. v. Eicher,* 202 Ill. 556, 67 N.E. 376; *Dent v. Great Atlantic & Pacific Tea Co.,* 4 Ill. App. 2d 500, 124 N.E.2d 360.

■■ As to what will constitute willful and wanton conduct, Illinois and some other jurisdictions have recognized that where a well-defined path or roadway has developed through continuous use or where a private path or roadway has been continuously used by the public through the tolerance of the landowner, an affirmative act of the landowner making the path or roadway more dangerous will, unless the landowner gives sufficient notice thereof to the public, constitute willful and wanton conduct sufficient for ·recovery· by any person injured thereby. *Moore v. Ohio Oil Co.,* 241 Ill. App. 388; *Wrigley v. Electric & Machine Co.* (7th Cir. 1969) 419 F.2d 972; Annot., "Liability—Private Road or Driveway," 44 A.L.R. 3d 355, §§19—22 at 404—24 (1972).

In *Moore* the plaintiff brought an action to recover for personal injuries she sustained when the car in which she was riding struck a wire

cable which had been stretched across a roadway at a point where the cable could not be readily seen. The evidence showed that the road was a private road from the public highway to the farm house of the defendant; that the road had been used for a long time, with defendant's knowledge, by all persons going to and from defendant's house; that on the day on which the plaintiff was injured the defendant had stretched the cable across the road; that no flag, signal, or any other type of warning had been placed near the cable; and that when the injury occurred the plaintiff was en route to visit an employee of the defendant, who apparently lived on the farm. The trial court directed a verdict for the defendant after all the evidence had been presented. On appeal the case was reversed and remanded to be submitted to the jury. The court stated:

> "The view founded in natural justice, which has the approval of many courts, is that when a landowner has knowingly permitted licensees to use a well defined path or roadway across his premises for some time he should not by any affirmative act make the roadway more dangerous for such licensees without giving them notice of the changed conditions, and if he fails to give notice of the fact that he has made the way more dangerous he will be held to respond in damages for the resulting injury. [Citations.]
>
> Where the public has been accustomed to travel a well defined road across one's land, he is liable to a licensee for personal injuries occasioned by a wire or rope stretched across the road if he has given no warning of the changed condition. [Citations.]
>
> The courts of this State have frequently said that the owner of land assumes no duty to one who is on his premises by permission, as a mere licensee, except that he will refrain from wilful or affirmative acts which are injurious. [Citations.] So far as we are advised they have never had occasion to consider what 'affirmative acts' would be sufficient to impose a liability upon the landowner. We are of the opinion that when defendant stretched the wire across the roadway without giving any warning of the changed condition it was such an affirmative act as would create a liability to one who was thereby injured while in the exercise of due care." 241 Ill. App. 388, 390-91.

In *Wrigley* the plaintiff, as administratrix, brought an action for wrongful death caused when the deceased drove a motorcycle into a cable which had been stretched across a private rock-surfaced road leading to an abandoned mine being salvaged by the defendant. At the

intersection of the private road and the public road from which the private road branched was a small sign reading "private property no trespassing." One witness testified that the private road was frequently used on weekends by motorcyclists for recreational purposes. An employee of the defendant testified that the road was used by the general public to attend the sale of machinery and equipment used by the abandoned mining operation. The cable was strung between two posts on either side of the private road. It hung about 3 feet above the surface, was rusty, and had two grey rags, each 6 or 7 inches wide and a foot and a half long, attached. (Although the exact distance from the public road to the point at which the cable was stretched is not clear from the opinion, it is apparent that that distance was at least greater than 300 feet and possibly greater than a quarter-mile.)

Another motorcyclist who had been riding along with the deceased at the time of the incident testified that he had driven on the road two or three months prior to the incident when the cable had not been stretched across the road. He testified that he had not been aware of the cable and that, to the best of his knowledge, the deceased had never been on the road before and did not know about the cable. At the close of all the evidence the trial court directed a verdict in favor of the defendant on a negligence count of the complaint and set aside a jury verdict in favor of the plaintiff on a count alleging willful and wanton conduct on the part of the defendant. On appeal the court reversed and remanded with directions to reinstate the verdict in favor of plaintiff on the count charging willful and wanton conduct. In so doing the court relied primarily upon *Moore*.

Turning to the facts of the instant case, it is clear from the authorities cited above that on the night of this occurrence, Gilbert Trout was not an invitee of defendant. There was no evidence that he was a customer of the bank or that he was on the bank lot by express or implied invitation to transact any business or to promote any interest of the bank. In fact, the evidence was clearly to the contrary. Similarly there was no evidence that the defendant had any knowledge that Trout or anyone else used the lot at night or that defendant continuously acquiesced in such use. The fact that the chain had been in use for 8 to 12 months (according to the testimony of Klein and Dome) would seem to negate any inference of acquiescence by defendant. Since Trout was on the bank lot without the consent, express or implied, of defendant, he was present not as a licensee, but merely as a trespasser. However, in light of the above authorities, a determination that Gilbert Trout was a trespasser rather than a licensee is neither required nor of controlling

significance here; for the standard of care required of defendant with respect to Gilbert Trout as a trespasser or as a licensee was to refrain from willful or wanton conduct that would cause an injury.

■■ While there is no positive evidence in the record that the defendant operated the lot or put the chain up, we are of the opinion that even if it is to be inferred that defendant did so, its conduct was not willful and wanton, and the evidence when viewed in its aspect most favorable to plaintiff, so overwhelmingly favors defendant that no contrary verdict based on the evidence could ever stand, and the court did not err in directing a verdict for defendant. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 229 N.E.2d 504.

The facts of the instant case are significantly different from the facts in *Moore* and *Wrigley* in a number of respects. The bank lot, although paved and apparently having driveways on both West Main and Washington streets, was not shown to be a road or well defined path continuously used by the public at night. As pointed out above, there was no evidence that the bank had knowledge that the lot was used for any purpose at night. That Klein had traversed the lot ten times at night and that Klein and Trout had traversed the lot once during the day would not show sufficient public use to bring the instant case within the standards of *Moore* and *Wrigley*. Moreover, the evidence in the instant case, in contrast to the evidence in *Moore* and *Wrigley*, did not show that the chain across the bank lot had been put up abruptly, without warning, shortly prior to the death of Gilbert Trout. To the contrary, the evidence showed that the chain had been in use at night for at least 8 to 12 months prior to this occurrence.

The trial court did not err in directing a verdict for defendant. Furthermore, plaintiff would be in no better position to recover under her complaint as amended pursuant to her motion filed with this court. The judgment is therefore affirmed.

Affirmed.

G. J. MORAN and EBERSPACHER, JJ., concur.