DAVID BOFMAN, Adm'r of the Estate of Mark Bofman, Deceased, *et al.*, Plaintiffs-Appellants and Cross-Appellees, *v.* MATERIAL SERVICE COR-PORATION, Defendant-Appellee and Cross-Appellant.

First District (2nd Division)   No. 83—209

Opinion filed June 26, 1984.—Rehearing denied July 24, 1984.

1054

William D. Maddux & Associates and Peter Fitzpatrick & Associates, both of Chicago (William D. Maddux, Bruce M. Lane, Richard F. Lee, and Brendan J. Keleher, of counsel), for appellants.

Lord, Bissell & Brook, of Chicago (Stephen A. Milwid, Daniel I. Schlessinger, and Hugh C. Griffin, of counsel), for appellee.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

An action against defendant Material Service Corp. (MSC), for injuries sustained by plaintiffs Edwin Talbot and John Diacou and for the death of plaintiff's decedent Mark Bofman in a boating accident on MSC's property, resulted in the jury's verdict for plaintiffs and its assignment of 82% comparative negligence to each of them. MSC cross-appeals from the denial of its motion for a directed verdict and for judgment notwithstanding the verdict.

The issues raised on appeal include whether: (1) plaintiffs were comparatively negligent as a matter of law; (2) the jury's finding of comparative fault assigned to each plaintiff was against the manifest weight of the evidence; (3) the testimony of a witness regarding his alleged conversation with the boat's occupants was erroneously admitted; (4) a certain jury instruction was erroneously given; and, (5) MSC's motions for a directed verdict and for judgment notwithstanding the verdict should have been sustained, the last issue being raised on cross-appeal.

The record reveals the following evidence. The boating accident occurred within a sand and gravel "wet pit" operated by MSC near Morris, Illinois. Originally a dry gravel quarry, MSC created the wet pit in the mid-1950s by dredging a channel, one-quarter mile long, between 300 and 400 feet wide and 11 to 12 feet deep, connecting the pit to the Illinois River, which ultimately flows into the Mississippi River. The wet pit at the time of the accident was about two miles long, one-quarter to one-half mile wide, and varied between 10 and 20 feet in depth. The pit and channel contained 196,416,000 cubic feet, or 1,469,293,000 gallons, of water. Besides its sand and gravel business, MSC used the pit for a "fleeting operation," allowing barge operators using the Illinois River to dock their barges for a daily fee.

Sometime before 1957, MSC partially submerged a 50- by 50-foot barge in the pit and affixed it to the bottom with pilings for use in its fleeting operation. After subsequent dredging around it, the barge was 200 to 300 feet from land. One corner of the barge jutted out of the water at an angle. At normal water levels it was two to three feet above the water; at other times it was completely submerged. Until two or three years before July 1974, the barge had been lighted. Neither the barge nor a buoy attached to it were illuminated nor treated with reflective paint thereafter.

MSC employees, Harry Petersen, operating engineer, and Richard Stephens, site superintendent, testified that MSC's policy was to keep private boaters out of the pit. Toward this end, two 7- by 14-foot

signs were posted on land on either side of the channel at its junction with the Illinois River, which read: "NO TRESPASSING/PRIVATE WATER AND LAND/VIOLATORS WILL BE PROSECUTED/MATERIAL SERVICE CORP." Two similar signs were posted on land midway into the channel. No sign warned of the sunken barge or of any danger. There were no signs in the pit area. A small "no trespassing" sign was affixed to a movable pontoon gate, located one-half to two-thirds of the way into the channel, which blocked passage to the pit and was designed to keep out private boaters. Although kept closed during daytime weekends, the gate was left open at night to accommodate the MSC fleeting operation. Boaters and picnickers were customarily chased from the pit. Trespassers were never prosecuted, however. On Sundays, MSC generally had two men on duty patrolling the area in a tugboat, opening and closing the gate for commercial traffic, and keeping boaters out of the pit, but not the channel.

Stephens lived near the pit and heard motorboats operating there after dark. Kenneth Yard, who lived immediately adjacent to the pit, frequently saw private boats and water-skiers in the pit and heard such boats operating in the pit after dark. He regularly boated in the pit himself, but was never asked by MSC's employees to leave. He sometimes saw boaters being "shagged out," but only during working hours. Charles Swanson testified that he and others in his water-ski club often used the pit on weekends for boating, skiing and camping. He was never chased from the property.

At about noon on Sunday, July 14, 1974, Diacou, Bofman and Richard Votava met and launched Votava's 17-foot fiberglass boat, equipped with a 150-horsepower engine, into the Illinois River at Morris. Talbot joined the group later in the afternoon. Votava had boated in the channel and pit area many times before; the others had never been there previously. The group spent the day boating, water-skiing, swimming and picnicking, primarily in the channel, along with numerous other boaters. The pontoon gate blocked the channel and MSC's tugboat was observed on the other side of the gate. Diacou walked across the gate and noticed the men in the tug laughing at him. Votava made "small talk" with them, but denied being warned to stay out of the pit. At about 7:30 p.m., the gate was opened. Votava piloted the boat into the pit at about 8 p.m. Darkness began to fall. The boat circled the pit but soon ran out of gas and stopped. The gas remaining in two gas tanks was combined and the engine was restarted about 20 minutes to one-half hour later.

The sky was still light in the west, but the water was quite dark. Running lights on the boat permitted it to be seen by others, but did

not illuminate the water ahead. Votava sat in front and piloted the boat at speeds of 25 to 30 miles per hour. Bofman sat beside Votava. Diacou and Talbot were in the back. Talbot, sitting on the gunwale, tried to maintain a lookout and discerned a "dark object," like a log, in the water ahead. Before he could say anything, the boat struck something and "stopped dead," throwing its occupants forward. Diacou only remembered waking up on the barge and seeing the boat on the barge. Votava saw the barge when he first entered the pit, but not just before the impact, when he lost consciousness. All the occupants suffered physical injury; Bofman died by reason of his injuries three weeks later.

Van Petersen, MSC's foreman, worked on MSC's tugboat in the pit on the day of the accident. The vessel's pilot was Frank Graves, who died prior to trial. They closed the gate in the morning and patrolled the area during the day, turning away private boats at the gate. He saw plaintiffs' boat in front of the gate, recognizing it from having seen it lodged on the barge the following day. He conversed with two or three of the boat's occupants, young men in swimming trunks, and told them he had orders to keep them "out of the dangers in the pit." He could not recall the hour of the conversation, the color of the boat, or any physical characteristics of its occupants.

Plaintiffs filed a complaint on March 2, 1976, which contained counts in admiralty and premises negligence and in wilful and wanton misconduct, naming as defendants MSC and Votava. In 1977, Votava paid consideration to each of the plaintiffs in exchange for covenants not to sue. Consequently, plaintiffs' first amended complaint filed on October 12, 1982, only named MSC as defendant. MSC's answer placed the allegations at issue.

Prior to trial, which began on October 14, 1982, the circuit court allowed plaintiffs' motions *in limine* for protective orders to exclude evidence relating to: the boating party's ingestion of intoxicants; the use of excess speed in the operation of the boat prior to the occurrence; and Votava's separate action against MSC. The court denied plaintiffs' motion to exclude Van Petersen's testimony relating to his alleged conversation with the boaters.

On October 28, 1982, the jury returned a general verdict in favor of plaintiffs, but reduced each of plaintiffs' total damages by 82%, the degree of comparative negligence found attributable to plaintiffs and plaintiff's decedent. A separate verdict awarded damages to Bofman's estate to compensate it for funeral and burial expenses. The circuit court on December 28, 1982, allowed MSC's post-trial motion and ordered setoffs of the jury's award of damages by the amounts which

Votava paid to plaintiffs in settlement of their claims against him.

I

■ Plaintiffs contend that they were not comparatively negligent as a matter of law because, first, their trespassing on defendant's property was not, by itself, negligence. That issue is rendered moot because of the presence of other evidence arguably demonstrating some degree of negligence. Under the issues drawn by the pleadings and the issues instruction given, this could have included: plaintiffs' failure to heed posted warning signs and to maintain a proper lookout.

■ Plaintiffs insist that the foregoing facts show only the pilot's negligence, not that of the passengers. Plaintiffs' argument that no-trespassing signs bear little relationship to signs warning of existing danger finds support in *Davis v. United States* (7th Cir. 1983), 716 F.2d 418, 423, in which a no-swimming sign was held to be ineffective as a warning of submerged rocks to a diving swimmer. As to questions of lookout, however, whether plaintiffs should have insisted upon Votava's operation of the boat in a manner which would have afforded a proper lookout (*e.g.*, reduced speed in view of limited visibility), was a question for jury resolution. A vehicle operator's negligence may not be imputed to the passengers (*Andes v. Lauer* (1980), 80 Ill. App. 3d 411, 414-15, 399 N.E.2d 990), yet a passenger must exercise such care as particular circumstances dictate (*Hatcher v. New York Central R.R. Co.* (1959), 17 Ill. 2d 587, 593-94, 162 N.E.2d 362). A passenger, aware of danger which the operator fails to guard against, without taking action to protect himself, may himself be deemed negligent (*Flynn v. Chicago City Ry. Co.* (1911), 250 Ill. 460, 465, 95 N.E. 449), a question of fact (*Hatcher v. New York Central R.R. Co.* (1959), 17 Ill. 2d 587, 162 N.E.2d 362; *Street v. Finney* (1973), 9 Ill. App. 3d 638, 642-43, 292 N.E.2d 553). "At precisely what point the duty arises to change from passive reliance [upon the operator's control] to active protest is largely a factual question to be properly decided by the jury on the basis of available facts and circumstances." (*Pizano v. Trejo* (1971), 2 Ill. App. 3d 944, 948, 274 N.E.2d 861, citing 8 Am. Jur. 2d *Automobiles & Highway Traffic* sec. 527. See also *Hayes v. Alsburg* (1978), 72 Ill. 2d 560, 566-67, 382 N.E.2d 239.) Here, the jury was properly given the question of each plaintiff's comparative negligence. *Davelis v. Central Engineering Co.* (1980), 86 Ill. App. 3d 593, 596, 408 N.E.2d 218.

## II

■ Plaintiffs next contend that the jury's assignment of 82% comparative fault to each plaintiff was against the manifest weight of the evidence. The supreme court in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886, established "pure" comparative negligence as the law of this State, requiring that plaintiff's damages be reduced in proportion to his own degree of fault. Illinois Pattern Jury Instruction (IPI), Civil, No. A45.05 (2d ed. 1971), given in this case, mandated the jury to "[d]etermine what proportion or percentage is attributable to that plaintiff or decedent of the total combined negligence of that plaintiff or decedent and the negligence or wilful and wanton conduct of the defendant *and of all other persons* whose negligence or wilful and wanton conduct proximately contributed to that plaintiff's injury or decedent's injury and death." (Emphasis added.) The determination therefore requires consideration not only of plaintiffs' and defendant's fault, but that of nonparty tortfeasors as well. The instant jury was bound to consider the negligence of plaintiffs, MSC, and Votava, the pilot of the boat, in calculating the "total combined negligence."

The jury's finding, that each plaintiff's fault comprised 82% of the "total combined negligence," is unsupportable, when Votava's conduct is considered. Votava, as pilot of the boat: brought the others into the pit area with him; had boated in the pit area on approximately 50 previous occasions; admittedly had spoken with MSC employees earlier who claimed to have warned against dangers in the pit; knew of the partially submerged barge and the dangers it posed; decided to enter the pit area despite questionable visibility; was responsible for the short supply of fuel; and controlled the speed and direction of the boat. Plaintiffs, as passengers who had never previously been in the pit area, one or more of whom had no conversations with MSC employees, could not possibly have been equally or more negligent than Votava, the boat's pilot, under the evidence in this case.

Prior to the advent of comparative negligence, Illinois courts have held that a verdict will not be set aside as being against the manifest weight of the evidence unless all reasonably intelligent minds would reach a different conclusion (*Richard v. Illinois Bell Telephone Co.* (1978), 66 Ill. App. 3d 825, 839, 383 N.E.2d 1242) or unless it is clearly evident that jurors have reached a wrong conclusion or an incorrect result (*Rowlett v. Hamann* (1969), 112 Ill. App. 2d 121, 251 N.E.2d 358; *Cochran v. Parker* (1968), 91 Ill. App. 2d 56, 233 N.E.2d 443). No reported case has been cited or found with

respect to the standards of judicial review of a comparative negligence verdict in the Illinois State court system; this case therefore appears to be one of first impression.[1]

Courts in other "pure" comparative negligence jurisdictions have expressed reluctance to interfere with a jury's apportionment of fault in terms similar to Illinois courts in ordinary jury cases, but they have done so when such verdicts were deemed "against the weight of the evidence" (*Lopato v. Kinney Rent-A-Car, Inc.* (1979), 73 App. Div. 2d 565, 423 N.Y.S.2d 42; *Mass v. Leinker* (1975), 46 App. Div. 2d 383, 362 N.Y.S.2d 552); or "against the manifest weight of the evidence" (*Diaz v. Certified Marine Industries, Inc.* (Fla. App. 1977), 346 So. 2d 1211; *Kinsey v. Kelly* (Fla. App. 1975), 312 So. 2d 461); or against the "preponderance of the evidence" or "overwhelming weight of the evidence" or "palpably against the weight of the evidence" (*Winstead v. Hall* (1965), 251 Miss. 800, 171 So. 2d 354; *Moak v. Black* (1957), 230 Miss. 337, 92 So. 2d 845; *Vaughan v. Bollis* (1954), 221 Miss. 589, 73 So. 2d 160); or "clearly erroneous" (*State v. Kaatz* (Alas. 1977), 572 P.2d 775). (See also Am. Jur. 2d, New Topic Service, *Comparative Negligence* sec. 50 (1977).) The rule in "modified" comparative negligence States is little different. (See, *e.g., Caldwell v. Piggly Wiggly Madison Co.* (1966), 32 Wis. 2d 447, 459, 145 N.W.2d 745, 752 ("probable miscarriage of justice"); *Smith v. Carriere* (Minn. 1982), 316 N.W.2d 574, 575 (absence of evidence to reasonably support the jury's verdict). See also V. Schwartz, Comparative Negligence ch. 18 (1974).) We believe the manifest weight of the evidence standard should be applied to comparative negligence jury verdicts.

■ The jury in the case *sub judice* apparently misunderstood IPI Civil No. A45.05 and did not consider Votava's negligence in its computation, or it improperly imputed Votava's negligence to plaintiffs. In either event it is clear that the jury's finding here that plaintiffs were individually chargeable with 82% comparative negligence was unreasonable, contrary to the manifest weight of the evidence, and the cause must be reversed. (*McIntyre v. Belt Ry. Co.*

---

[1]The Seventh Circuit Court of Appeals has recently considered and reversed, in part, a comparative negligence judgment entered by the district court in *Davis v. United States* (7th Cir. 1983), 716 F.2d 418, applying Illinois law. The discussion there pertaining to judicial review of a trial court's apportionment of fault postulated the rule that a court of review would reverse "if we have a firm conviction that it is wrong." (716 F.2d 418, 430.) The two cases cited in support thereof, however, both involved jury verdicts. In *Szarat v. City of Chicago* (1983), 117 Ill. App. 3d 809, 454 N.E.2d 68, no standard was discussed.

(1969), 105 Ill. App. 2d 45, 245 N.E.2d 94, *appeal denied* (1969), 40 Ill. 2d 580; see also *Walls v. Hofbauer* (1977), 45 Ill. App. 3d 394, 359 N.E.2d 1037.) The jury determination of the initial amount of plaintiffs' damages shall stand. The circuit court is directed to grant plaintiffs a new trial limited solely to the issue of apportionment of negligence attributable to the plaintiffs or decedent of the total combined negligence of the plaintiffs or decedent and the negligence of the defendant and of all other persons whose negligence proximately contributed to plaintiffs' injuries or decedent's injury and death. IPI Civil No. A45.05.

### III

Since this cause must be retried as directed above, certain issues alleged to have been erroneously decided may again arise and will be considered here.

■ Plaintiffs contend that they were prejudiced by the erroneous admission of Van Petersen's testimony as to his alleged conversation with some of the boat's occupants. Conversations otherwise material and relevant are competent and admissible provided the parties to the conversations are identified either by direct evidence or by surrounding facts and circumstances. *O'Brien v. Walker* (1977), 49 Ill. App. 3d 940, 952, 364 N.E.2d 533.

■ Here, despite Petersen's inability to positively identify which of the plaintiffs or decedent he spoke to, he identified them as two or three "younger" men in their twenties or older, in swimming trunks, who had been swimming and water-skiing, and were on the same boat he saw the following day lodged on the barge. Earlier, Diacou and Votava also testified to some interaction with the men on the tugboat, although each denied being warned to stay out of the pit area because of potential danger. Their testimony, together with Petersen's positive identification of the boat, allowed the jury to believe that conversations took place. Petersen's testimony was therefore properly admitted; any conflict as to its substance was for the jury to resolve. The absence in Petersen's recall of the hour of the conversation and the color of the boat did not render his testimony incompetent. His observations need not have been positive or absolutely certain; it suffices that he had an opportunity to observe, recall and relate impressions from his observations. 2 Wigmore, Evidence sec. 658(b), at 894 (Chadbourn rev. 1979).

■ ■ Plaintiffs argue that, even if Van Petersen's testimony was admissible to show the knowledge of the potential danger on the part of Diacou, the only plaintiff acknowledging conversation

with the men on the tug, the circuit court erred by failing to limit the application of this testimony to Diacou alone. Evidence which is competent as against one party but not another is admissible, provided the jury is instructed to consider such evidence for its proper purpose only. (*Consolidated Ice Machine Co. v. Keifer* (1890), 134 Ill. 481, 494, 25 N.E. 799; *Eizerman v. Behn* (1956), 9 Ill. App. 2d 263, 279-80, 132 N.E.2d 788; *Porro v. P.T. Ferro Construction Co.* (1979), 72 Ill. App. 3d 377, 382, 390 N.E.2d 958.) The challenged testimony was highly probative of, and therefore relevant to prove, plaintiffs' knowledge of the dangers of the pit area; its prejudicial effect was an insufficient ground to exclude it entirely (see *Bell v. City of Joliet* (1980), 83 Ill. App. 3d 103, 106, 403 N.E.2d 740) and the circuit court did not abuse its discretion by admitting this testimony. (*LeMaster v. Chicago Rock Island & Pacific Ry. Co.* (1976), 35 Ill. App. 3d 1001, 1026, 343 N.E.2d 65. See also, *Needy v. Sparks* (1977), 51 Ill. App. 3d 350, 365, 366 N.E.2d 327; *Ferdinand v. Yellow Cab Co.* (1976), 42 Ill. App. 3d 279, 286, 355 N.E.2d 547; 1 Wigmore, Evidence sec. 10a, at 674-80 (Tillers rev. 1983); Fed. R. Evid. 403.) A party who seeks to limit such evidence to the announced purpose is obligated to request the appropriate limiting instruction, or will be deemed to have waived its objection. (*Jeanguenat v. Zibert* (1979), 78 Ill. App. 3d 948, 953, 397 N.E.2d 1235; *Greig v. Griffel* (1977), 49 Ill. App. 3d 829, 838, 364 N.E.2d 660; 1 Wigmore, Evidence sec. 13, at 697 (Tillers rev. 1983); McCormick, Evidence sec. 59, at 136 (2d ed. 1972).) Plaintiffs here did not request such an instruction and have waived its absence.

IV

■ Plaintiff Diacou alone argues that IPI Civil No. A45.05, the comparative negligence instruction, contains confusing language which prompted the instant jury to improperly impute to plaintiff the negligence of others. Counsel for Diacou objected only generally to the instruction because "comparative negligence [did not belong] *** in the case." An objection to an instruction "shall be particularly specified" (87 Ill. 2d R. 239(b)); failure to do so waives the objection for purposes of appeal. (*Bean v. Norfolk & Western Ry. Co.* (1980), 84 Ill. App. 3d 395, 406, 405 N.E.2d 418.) Assuming, *arguendo*, that they had been properly preserved, his contentions must be rejected.

Diacou specifically assigns error to the provision in IPI Civil No. A45.05 which requires the jury to consider the negligence of "all other persons" in computing "total combined negligence." First, he

maintains that the jury should never have considered the negligence of nonparties, as this led to an improper imputation to plaintiff of negligence not his own. Consideration of the negligence of both parties and nonparties to an action is essential for determining liability commensurate with degree of total fault. If, as Diacou suggests, the conduct of Votava, a nonparty, were to have been omitted from this computation, the 82% negligence attributed to plaintiffs could not be said to have been manifestly erroneous.

■■■ Diacou argues further that taking into account the negligence of nonparties undermines the doctrine of joint and several liability, retained with respect to comparative negligence by the supreme court in *Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 123, 454 N.E.2d 197. The purpose of considering the liability of nonparty tortfeasors is not, as Diacou suggests, to limit defendant's share of responsibility, but to determine the extent of plaintiff's responsibility for his own injuries. This is consonant with the mandate in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 25, that plaintiff's damages under "pure" comparative negligence are to be "reduced by the percentage of fault attributable to him." Defendants remain jointly and severally liable for that portion of damages for which each plaintiff is *not* responsible, regardless of whether some of those damages are attributable to a nonparty.

## V

On cross-appeal MSC argues that a directed verdict or judgment notwithstanding the verdict should have been granted in its favor. MSC first contends that, as a matter of law, it was not liable on the counts alleging wilful and wanton misconduct.

■■■ ■ An owner or occupier of land owes a duty to both trespassers and licensees to avoid wilfully and wantonly injuring them. (*Votava v. Material Service Corp.* (1979), 74 Ill. App. 3d 208, 212, 392 N.E.2d 768; *Trout v. Bank of Belleville* (1976), 36 Ill. App. 3d 83, 86, 343 N.E.2d 261.) Wilful and wanton misconduct does not require an owner to intend harm; notice to him of a condition on the property "which would alert a reasonable man that substantial danger was involved and that he failed to take reasonable precautions under the circumstances" is sufficient. (*Beverly Bank v. Penn Central Co.* (1974), 21 Ill. App. 3d 77, 82, 315 N.E.2d 110.) The existence of wilful and wanton misconduct is peculiarly a question of fact for a jury. (*Delany v. Badame* (1971), 49 Ill. 2d 168, 177, 274 N.E.2d 353; *Murphy v. Jewel Companies, Inc.* (1974), 24 Ill. App. 3d 1, 5, 320 N.E.2d 47.) Moreover, a directed verdict or judgment

*n.o.v.* can be properly entered only if all of the evidence, when viewed in its aspect most favorable to plaintiffs, so overwhelmingly favors defendant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) Under this stringent standard, the circuit court here properly submitted this question to the jury.

The evidence showed that MSC attempted to keep boaters out of the pit area by erecting "no trespassing" signs, operating a pontoon gate to block access to the pit, and ordering boaters to leave who did enter the pit. Other evidence, however, showed that the "no trespassing" signs were placed only in the channel, not the pit, and conveyed no warnings of danger. Although a buoy was affixed to the barge, neither was illuminated nor bore reflective paint. Defendant's superintendent, who lived nearby, heard motorboats in the pit after dark, when the pontoon gate was left open. A neighbor saw many boaters in the pit by day and regularly heard them there by night. There was other testimony that boaters were permitted to use the pit even in the presence of defendant's employees.

■■ ■ The failure of an owner or occupier of land to warn of a concealed dangerous condition of which he is aware constitutes wilful and wanton misconduct. (*Latimer v. Latimer* (1978), 66 Ill. App. 3d 685, 688, 384 N.E.2d 107.) In evaluating an owner's duty to warn of a hidden danger, courts consider the likelihood and gravity of threatened injury, the burden imposed in guarding against the injury, and the consequences of placing this burden on the owner. (*Smith v. Goldman* (1977), 53 Ill. App. 3d 632, 634, 368 N.E.2d 1052.) MSC, through its site superintendent, was on notice that the pit was used at night by private boaters. The barge was not clearly visible after darkness fell. It cannot be said as a matter of law, therefore, that MSC's efforts to warn of the danger were sufficient to overcome the jury's finding of wilful and wanton misconduct. It was foreseeable that a boat might hit the barge at night and that the resulting injury would be great. In contrast, the burden imposed on defendant to prevent such harm, illuminating or marking the barge or buoy and erecting signs that warned of the danger, was slight.

In *Davis v. United States* (7th Cir. 1983), 716 F.2d 418, a swimmer was injured by subsurface rocks in the owner's lake. The Seventh Circuit Court of Appeals found that the owner was guilty of wilful and wanton misconduct under Illinois law. There, the owner's maintenance of "no swimming" and "no diving" signs, as well as occasional efforts to verbally warn and expel swimmers, were found

inadequate to warn trespassers of the hidden danger. In another Federal case considering Illinois law, cited by MSC, red and orange lights and signs containing the words "restricted" and "danger" were found adequate to warn of the danger there, especially since plaintiffs' decedents should have realized the substantial risk inherent in placing their boat in front of the gate of an operating dam. (*Kohl v. United States* (7th Cir. 1983), 712 F.2d 286.) The instant facts, more nearly paralleling those in *Davis* than those in *Kohl*, justified submitting the wilful and wanton misconduct counts to the jury.

## VI

MSC further contends that because the pit did not constitute navigable waters of the United States as a matter of law, submission to the jury of counts in ordinary negligence, premised upon Federal maritime law, was error. According to applicable law,

"*** whenever a vessel, raft or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day *and a lighted lantern at night ***.*" (Emphasis added.) (33 U.S.C. sec. 409 (1976).)

Federal regulations, moreover, provide for liability to the public for damage caused by a wreck in navigable waters. (33 C.F.R. sec. 64.01—1(a) (1975).) The propriety of submitting the negligence counts to the jury thus turns on whether the pit can be characterized as navigable waters.

Waters are navigable and amenable to Federal regulations if they are subject to tidal fluctuations or have been, are, or in the future could be used for interstate transport or foreign commerce. (33 C.F.R. sec. 329.4 (1978); *Kaiser Aetna v. United States* (1979), 444 U.S. 164, 171 n.6, 62 L. Ed. 2d 332, 341 n.6, 100 S. Ct. 383, 388 n.6.) Inland waters not subject to tidal ebb and blow must be deep and wide enough to permit commercial vehicles to pass, in other words be "navigable in fact," and must link up with an interstate navigable waterway. (See, *e.g.*, *National Wildlife Federation v. Alexander* (D.C. Cir. 1979), 613 F.2d 1054, 1065-66; *Minnehaha Creek Watershed District v. Hoffman* (8th Cir. 1979), 597 F.2d 617, 621.) In the present case, evidence was adduced that the channel and pit were created, for the most part, by water diverted from the Illinois River, a navigable waterway. They are deep enough to accommodate commercial vessels and regularly do so. The record shows that, for

a fee, MSC permitted barge operators plying the Illinois River to use the wet pit as a docking area for their barges. For purposes of Federal regulations, the channel and wet pit qualify as navigable waters. *Cf. Votava v. Material Service Corp.* (1979), 74 Ill. App. 3d 208, 392 N.E.2d 768.

██ An instruction based upon *Vaughn v. Vermilion Corp.* (1979), 444 U.S. 206, 62 L. Ed. 2d 365, 100 S. Ct. 399, and upon *Schulte v. Warren* (1905), 218 Ill. 108, 75 N.E. 783, was given to the instant jury. In *Vaughn*, decided December 4, 1979, after *Votava v. Material Service Corp.*, the United States Supreme Court remanded the cause for a fact determination as to whether the waterway there—a private canal system connected to navigable waters— was itself "navigable waters" accessible for public use. The court distinguished between channels built on private property with private funds in such a manner as to join existing navigable waterways, and those similarly built, but which also involved "the *diversion* or destruction of a pre-existing natural navigable waterway." (Emphasis added.) (*Vaughn v. Vermilion Corp.* (1979), 444 U.S. 206, 208, 62 L. Ed. 2d 365, 368, 100 S. Ct. 399, 401.) The latter circumstance, if proven, would justify a finding that the channels were navigable waters, the public use of which could not be enjoined. In *Schulte*, our supreme court held that the owner of lands inundated by the Illinois River, the covering waters of which were of such depth and volume as to be navigable, retained ownership of the lands subject only to a public easement of navigation on the waters overflowing land permanently submerged. (*Schulte v. Warren* (1905), 218 Ill. 108, 118-22.) It cannot be said that the circuit court here erred by permitting the jury to determine whether the pit constituted navigable waters subject to the regulation that sunken vessels, such as the subject barge, be appropriately marked or illuminated. Accordingly, it also was not error to permit the jury to consider the negligence counts grounded in Federal law governing the use of navigable waters. Assuming, *arguendo*, that the negligence counts had been erroneously submitted, moreover, the properly submitted wilful and wanton misconduct counts otherwise support the general verdict returned by the jury.

██ MSC's reliance upon *DuPont v. Miller* (1923), 310 Ill. 140, 145-46, 141 N.E. 423, is misplaced. In *DuPont*, the Illinois Supreme Court required clear and convincing evidence of dedication to the public of privately owned waters in order for such waters to be considered navigable. The appellate court in *Votava v. Material Service Corp.* (1979), 74 Ill. App. 3d 208, 392 N.E.2d 768, applied this test.

The *DuPont* test is inapplicable here, however, for several reasons. First, in *DuPont* the waters involved were not subject to federal regulation. (33 U.S.C. sec. 27 (1976); *Leitch v. Sanitary District* (1938), 369 Ill. 469, 474-75, 17 N.E.2d 34.) Second, there was no issue in *DuPont* as to the application of Federal law or regulations, the court there specifically noting that waters within this State were subject "*** to the power of the Federal government to enact such legislation and make such regulations as relate to interstate commerce." *DuPont v. Miller* (1923), 310 Ill. 140, 145.

From the foregoing, we affirm the judgment as to the liability of defendant. We are compelled to reverse and remand the cause for a new trial on the sole issue of comparative negligence. The amount of damages shall stand without the need for submission of such evidence.

Affirmed in part; reversed and remanded in part.

STAMOS and DOWNING, JJ., concur.