LOUIS WILSON, JR., Plaintiff-Appellee, v. CLARK OIL & REFINING CORPORATION *et al.*, Defendant-Appellant.

Fifth District   No. 5—84—0483

Opinion filed July 10, 1985.

Pope & Driemeyer, of Belleville (W. Thomas Coghill, Jr., and Edward S. Bott, Jr., of counsel), for appellant Clark Oil & Refining Corporation.

Robert H. Rice, of Belleville (Philip R. Rice, of counsel), for appellee.

PRESIDING JUSTICE JONES delivered the opinion of the court:

Plaintiff, Louis Wilson, Jr., brought this action to recover damages for injuries he sustained as a result of the alleged negligence of the defendants, Lester Cordevant and Clark Oil and Refining Corporation (Clark). The plaintiff's injuries resulted when he was shot accidentally by Cordevant, an employee of Clark, at a gasoline service station operated by Clark in Washington Park. The plaintiff's motion to dismiss Cordevant as a defendant was granted at the close of the plaintiff's case, and the jury subsequently returned a verdict for the plaintiff and against Clark, holding Clark liable under the doctrine of *respondeat superior*. On appeal from the judgment entered on the verdict, Clark contends that the evidence failed to show that its employee, Cordevant, was acting within the course and scope of his employment with Clark at the time of the occurrence. Clark contends additionally that, even if Cordevant was acting in the course and scope of his employment, Clark cannot be held liable under the doctrine of *respondeat superior* because the plaintiff was an invitee of Cordevant's or, at best, a mere licensee of Clark's when the accident occurred. We affirm.

The incident giving rise to the plaintiff's injuries occurred on June 14, 1982, at approximately 2:30 p.m., while Cordevant was working at a self-service gasoline station operated by Clark. Cordevant was the assistant manager of the station, which consisted of a small office building with a window facing out onto the parking lot and the gasoline pumps. There was a dump drawer at the bottom of the window through which customers could pay for their purchases. Inside the of-

fice were miscellaneous items such as soda, candy and cigarettes. It was company policy that the office itself was not open to members of the general public and the door was to be kept locked, although it was often unlocked during the day when the attendant on duty had to stock the vending machines or perform some other task that required going in and out of the office.

On the day of the incident a friend of Cordevant's, Paul Apostol, stopped at the station to buy cigarettes. As a police officer for the National City police department, Apostol carried his gun with him when he was off-duty, as he was on the date in question. When Apostol arrived at the station, the door to the office was unlocked with Cordevant inside, and Apostol went in to join him. Once inside the station Apostol took his .357 magnum pistol out of his jacket and placed it on the counter. Apostol and Cordevant were discussing their plans to go target shooting after Cordevant got off work that afternoon at 4 p.m., when the plaintiff, also a friend of Cordevant and Apostol, arrived at the station. The office was locked at that time, and Apostol unlocked the door to let the plaintiff in. Once inside, the plaintiff purchased a soda for his mother.

The three men stood inside the office discussing various things for about 15 minutes. All three men were facing out toward the parking lot, with Cordevant positioned furthest to the right, the plaintiff immediately to his left, and Apostol immediately to the left of the plaintiff. At one point Cordevant made a comment about the sight on Apostol's weapon being different from his own. Cordevant then reached over and picked the gun up off the counter in order to examine it. Apostol instructed him to unload the weapon and Cordevant did so. He then held the weapon up to examine the sight and dry-fired it several times. Cordevant began to reload the gun when he saw a woman customer who had gotten out of her car and was approaching the office. Cordevant hurriedly attempted to pass the gun back to Apostol, at which time the gun went off and shot the plaintiff in the side.

At trial Darryl Briggs, manager of the Clark station, testified that Clark had a policy that guns were not permitted on the premises. Apostol frequently visited the station and would always be armed, whether on his way to and from work or while he was off-duty and dressed in civilian clothes. Briggs had never told Apostol to leave because he had a gun. Although he had told his employees not to let anyone in the office, he had let Apostol in himself and did not feel it was breaking company policy to have Apostol in the office when he was there. Apostol had been in the office while Briggs was there ap-

proximately 30 times in he 5½ months before the accident. Briggs stated that he had never seen Apostol take his gun out and lay it on the counter and was not aware that he had done this.

Paul Apostol testified that he would visit the Clark station on his way to or from work from two to four times a week to do business and to visit friends. He had worked at the station before joining the police department, and both Briggs and Cordevant were good friends of his. He stated that he had been in the office at the station about 40 times in the 5½ months before the shooting and that, during this time, he had taken his gun out and laid it on the counter 10 to 15 times. No one had ever told him he could not do this, although there had been occasions when he had had his gun out while Darryl Briggs was present.

Apostol stated that the Clark station was the only other public place besides the police station where he would take the gun out and lay it down. When asked why he would take his gun out at the Clark station, Apostol responded that he

> "felt that the weapon would be safe sitting on the counter like that with people around I know. *** I just had the weapon sitting there because there were friends around and it was locked off from the public."

Apostol noted that while the door was locked to the public and "customers would come up and deal through a cashier's window," in the case of friends, "with everybody knowing each other," Cordevant would unlock the door and let them in when they came to the station.

Lester Cordevant testified that he had worked at the Clark station almost two years prior to the accident. He was aware of the Clark policy that employees were not allowed to carry guns on the station premises, as this was included in the employment contract signed by Clark employees every three years. Cordevant himself had obtained a police commission to carry a gun after he had been robbed while working at the station approximately five months before the accident. There had been two armed robberies within a week of each other at that time. Cordevant carried a gun for his protection when he came into the station on Saturdays and Sundays to take money to the bank. Briggs was aware that he had obtained the commission and that he carried a gun with him to the station on weekends, and, although Briggs had warned him that this was dangerous, he had not forbidden him from doing so.

Cordevant testified further that, despite Clark's policy against having the public in the office, both Apostol and the plaintiff had been there many times and that Briggs had been present at least 30 times

while Apostol was in the office. Cordevant explained that during the day while both he and Briggs were working, the door would be unlocked, and, instead of Apostol or "anybody that knows us" coming to the window to buy cigarettes, potato chips or candy, they would just come in. He stated, however, that Apostol would stay for "just a few seconds" and that "we don't allow people to be at the station to stay inside [*sic*]."

Cordevant testified that at the time of the shooting he had been in a hurry to hand Apostol's gun back to him because he did not want the woman customer who was approaching the window to see him with the gun in his hand. This was due to the company policy that customers should not see guns in the possession of attendants on duty. Cordevant stated that if there had been no customer approaching his window, he would have laid the gun back up on the counter.

Upon cross-examination later in the defendant's case, Briggs conceded that, as manager of the Clark station, he felt good about the security of the station when Apostol was on the premises with his gun because the station had had robbery problems over the last several years.

At the close of the evidence the jury returned a verdict for the plaintiff and against Clark, awarding damages to the plaintiff in the amount of $100,000.

On appeal from the judgment on this verdict, Clark contends initially that its employee, Lester Cordevant, was not acting within the course and scope of his employment with Clark so as to render Clark liable under the doctrine of *respondeat superior*. In particular Clark asserts that Cordevant's conduct involving the gun was not of the kind he was employed to perform and was not actuated by a purpose to serve the master. Clark contends further that it cannot be said to have ratified Cordevant's violation of its policy prohibiting guns because it did not have full knowledge of the facts regarding the use of guns on its premises.

■■ Under the doctrine of *respondeat superior*, an employer is liable for an employee's torts committed within the scope of that employment. There is no precise definition of "scope of employment"; however, the focus is generally upon the issues of whether the employee's act was conducted within the constraints of authorized time and location of the employment and whether the conduct was actuated at least in part by a purpose to further the employer's business. (*Sunseri v. Puccia* (1981), 97 Ill. App. 3d 488, 422 N.E.2d 925.) Illinois courts have looked to the Restatement (Second) of Agency (1958) for guidance in determining scope of employment:

"Section 228. General Statement

(1) Conduct of a servant is within the scope of employment if, but only if:

   (a) it is of the kind he is employed to perform;

   (b) it occurs substantially within the authorized time and space limits;

   (c) it is actuated, at least in part, by a purpose to serve the master ***.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Section 229. Kind of Conduct within Scope of Employment

(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized." (Restatement (Second) of Agency secs. 228, 229 (1958).)

Factors to be considered in determining whether conduct, although not authorized, is so similar or incidental to that authorized as to be within the scope of employment include whether or not the act is one commonly done by such servants; the time, place and purpose of the act; the previous relations between the master and servant; whether or not the act is outside the enterprise of the master; whether or not the master has reason to expect that such an act will be done; the similarity in quality of the act done to the act authorized; and whether or not the instrumentality by which the harm is done has been furnished by the master to the servant. (Restatement (Second) of Agency sec. 229(2) (1958).) Each case rests upon its own facts, and all features of the relation must be construed together. *Darner v. Colby* (1941), 375 Ill. 558, 31 N.E.2d 950.

■ Notwithstanding Clark's assertions here that Cordevant's actions involving the gun were not of the kind commonly done by its employees and were for his personal benefit rather than that of Clark's, the accident occurred as Cordevant was hurriedly passing the gun back to Apostol so that a woman customer, approaching his window to transact business, would not see the gun in his hand. Since Cordevant was Clark's representative to the public, it was important for Clark that he appear in the best possible light. Cordevant's job involved attending to customers at the window, and he was attempting to do this in the proper manner when the accident occurred. Further, although Cordevant was not authorized and was even forbidden to carry a gun during his employment, an employer is not relieved from

liability simply because an employee does a forbidden act while engaged in the business of the employer. (See Restatement (Second) of Agency sec. 230 (1958).) Here, Cordevant was on duty accepting customers' payments at the time and place authorized, and, despite his temporary lapse from proper conduct while handling the gun, the shooting occurred during and resulted from his attempt to wait on a customer. Thus, we cannot say that Cordevant's act was so unconnected with his duties as to be outside the scope of his employment.

■ In its argument Clark makes much of the fact that it had a policy prohibiting the possession of guns on its premises. The evidence demonstrates, however, that this policy was repeatedly violated and that Clark had knowledge of this fact through the manager of its station, Darryl Briggs. Testimony indicated that Apostol had been inside the station office with his gun on several occasions while Briggs was present, and that Briggs had never told him that he could not be in the office or that he could not bring his gun inside. There was even testimony by Apostol that he had taken his gun out and laid it on the counter in Briggs' presence, although Briggs himself denied this. Briggs stated that he did not consider it against company policy for Apostol to be inside with his gun and admitted that he felt more secure having Apostol at the station with a gun because of the robberies that had occurred there over the past several years. Finally, Briggs was aware that Cordevant himself carried a gun onto station premises on Saturdays and Sundays when he came in to take Clark money to the bank. Although he warned Cordevant that this was dangerous, he never told Cordevant that he could not do so. Clark, as principal, was chargeable with this knowledge of Briggs regarding a matter within his authority. Thus, although Clark may not have had knowledge of the specific occurrence giving rise to the plaintiff's injuries so as to have ratified Cordevant's actions with the gun, it cannot seek to avoid liability for the resulting accident because of its stated policy against guns.

■ ■ Clark next contends that even if the conduct immediately causing the plaintiff's injury was within the scope of Cordevant's employment, there could be no liability on the part of Clark because the plaintiff was an invitee of Cordevant's or, at best, a mere licensee of Clark's at the time the accident occurred. It is established that a master is not liable for injuries resulting from the conduct of a servant if the person harmed is on the master's premises through an unauthorized invitation of the servant, even though the conduct causing the injury is within the scope of the servant's employment. (Restatement (Second) of Agency sec. 242 (1958); see *Klatt v. Commonwealth Edi-*

*son Co.* (1965), 33 Ill. 2d 481, 211 N.E.2d 720.) A duty of reasonable care is owed, however, to one of the master's premises by express or implied invitation of the master, and a master is thus liable to such an invitee for the negligent acts of his servant. (*Gonzalez v. Batelli* (1974), 19 Ill. App. 3d 278, 311 N.E.2d 348.) The distinction between an invitee of the master and a mere licensee, to whom the master is liable only for wilful and wanton conduct, rests upon whether the injured person has entered the premises to transact business in which the parties are mutually interested (invitee) or to satisfy his own purposes (licensee). *Trout v. Bank of Belleville* (1976), 36 Ill. App. 3d 83, 343 N.E.2d 261; see *Gonzalez v. Batelli* (1974), 19 Ill. App. 3d 278, 311 N.E.2d 348.

■ In the instant case it is undisputed that both the plaintiff and Apostol had come to the Clark station to transact business—Apostol to buy cigarettes and the plaintiff to purchase a soda for his mother. Clark argues, however, that at the time of the occurrence the plaintiff was on a portion of the premises where customers were not intended to be in the course of their business and that, although the plaintiff had initially come onto the premises to transact business, this business had been concluded prior to the shooting and the plaintiff had remained upon the premises for his personal benefit, namely, to visit with friends.

We find no merit in this argument because the evidence demonstrated that, despite Clark's policy that the station office was off-limits to customers, both the plaintiff and Apostol were routinely allowed into the office when they would "come by," whether to make purchases or visit with their friends or both. As Cordevant stated at trial, the door to the office would be unlocked during the daytime while both he and Briggs were there, and, rather than coming to the window to buy cigarettes, potato chips or candy, "anybody that knows us" would just come in. Apostol too testified that although customers would come up and deal through a cashier's window, in the case of friends, "with everybody knowing each other," Cordevant would unlock the door to the office and let them in. Here again, Clark is charged with knowledge of this violation of its policy through its manager Briggs and cannot assert that, by reason of its policy, such customer/friends were invitees of Cordevant only and not its own.

■■ Clark's further argument that, at the time of the shooting, the plaintiff had ceased to be an invitee and had become a mere licensee as to Clark is likewise without merit. The instant situation is distinguishable from that in *Wesbrock v. Colby, Inc.* (1942), 315 Ill. App. 494, 43 N.E.2d 405, relied upon by Clark, where a woman cus-

tomer, who had completed her purchases and was leaving the store, decided to call her sister and entered into a hall stairway that was not open to the public. The *Wesbrock* court held that she could not be deemed an invitee of the store as to that stairway because she had gone into an area of the store not intended for the public for a purpose completely unrelated to her business in the store. In the instant case the plaintiff's injury occurred in the same area of the station where he normally conducted business with Clark, and there was not such a clear distinction as to his purpose in going there between his personal benefit and that of Clark's. The case of *Gonzalez v. Batelli* (1974), 19 Ill. App. 3d 278, 311 N.E.2d 348, also relied upon by Clark, may likewise be distinguished from the instant case because the evidence there showed that the plaintiff's activities in the defendant's store on the night of the accident "were completely unconnected with the business defendant Batelli conducted on the premises." 19 Ill. App. 3d 278, 283, 311 N.E.2d 348, 351.

We hold, therefore, that the evidence was sufficient to sustain the finding of liability against Clark for the plaintiff's injuries negligently inflicted by its employee Cordevant, and we affirm the trial court's judgment for the plaintiff.

Affirmed.

HARRISON and KASSERMAN, JJ., concur.