Suzanne FIGUEROA and Luis Figueroa, Plaintiffs–Appellants,

v.

## EVANGELICAL COVENANT CHURCH d/b/a North Park College, Defendant–Appellee.

### No. 88–3201.

United States Court of Appeals, Seventh Circuit.

Argued April 21, 1989.

Decided July 7, 1989.

As Amended on Denial of Rehearing Aug. 18, 1989.

---

to the existence of such a duty, so that the district court's grant of summary judgment was premature. We conclude that none of the issues about which the parties remain in dispute are material issues of fact and that summary judgment was appropriate in this case.

## I.

Evangelical Covenant Church, doing business as North Park College, owns a parking lot that adjoins the Northeastern Illinois University Child Care Center ("Center").[1] Parents dropping their children at the Center frequently used this parking lot, a practice apparently approved by North Park informally prior to 1982 and then formally recognized in a letter dated March 18, 1982. On the morning of May 12, 1983, Figueroa was abducted at gunpoint from North Park's parking lot after dropping her child off at the Center, and was subsequently sexually assaulted and slashed with a knife. She is suing North Park for its alleged negligent failure to provide adequate security in the parking lot. Her husband, Luis Figueroa, sues for loss of consortium in parallel counts.

North Park employed off-duty Chicago police officers to patrol its campus, including the parking lot. There was usually only one officer on duty at a time during the week. That officer patrolled the campus, reporting to particular buildings at designated times to lock and unlock doors. The security officers also concentrated on a foot bridge connecting the north and south campuses at times when the high school students from a neighboring school were likely to congregate there (morning, lunchtime and afternoon at the time high school classes ended). The college security office did make reports of any incidents that occurred on campus, but apparently did not keep records much longer than one or two years.[2] North Park security officers could

Lee H. Russell, Northlake, Ill., for plaintiffs-appellants.

James W. Ford, Scott R. Britton, Braun, Lynch, Smith & Strobel, Chicago, Ill., for defendant-appellee.

Before CUDAHY, COFFEY, and MANION, Circuit Judges.

CUDAHY, Circuit Judge.

The central issue in this diversity case is whether, under Illinois law, North Park College ("North Park") owed Suzanne Figueroa a duty to protect her from criminal attack.

In this appeal Figueroa and her husband argue that material issues of fact exist as

---

1. Northeastern Illinois University leased the building in which the Center was located from the Yugoslavian Seventh Day Adventist Church.

2. As a matter of common sense, any serious assault or incident would most likely be referred to the Chicago police, so that reports would then be available through the Police Department. Although plaintiff has presented a number of police reports dating back to 1980, only two appear to have involved North Park College in any way and neither was sufficiently similar to the Figueroa incident to have relevance in this case. (We reviewed this evidence

recall only minor incidents occurring on campus before the time of the assault on Figueroa; the only incident occurring in the area of the parking lot involved "some kids" throwing bottles.

The district court granted summary judgment to the defendant, ruling that as a matter of law North Park owed no duty to Figueroa. 698 F.Supp. 1408. We affirm.

## II.

In reviewing a grant of summary judgment we construe facts and draw inferences in favor of the nonmoving party, resolving against the movant any doubts about the existence of a genuine issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). The moving party is entitled to summary judgment if it can be shown that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ Although the burden is on the moving party to demonstrate that no genuine issues of material fact remain, the nonmovant must go beyond the pleadings to affirmatively demonstrate the existence of genuine issues for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 931 (7th Cir.1989). If the moving party can demonstrate the absence of a genuine issue as to *any necessary* element of the nonmoving party's case, it is entitled to summary judgment. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552 (moving party entitled to judgment if nonmovant "fails to make a showing

sufficient to establish the existence of an element essential to that party's case"). While the nonmovant's burden in making this showing is clearly a light one, failure to meet the burden as to even one essential element (if the element is one upon which the nonmovant will bear the burden of proof at trial) may result in summary judgment. Plaintiffs' brief at times suggests that, if there is an issue remaining as to *any* fact, summary judgment is inappropriate. However—to take one example—if plaintiffs have to demonstrate both invitee status *and* foreseeability to prove their "invitee" claims (Counts I and II), then absence of a material issue of fact as to foreseeability alone is fatal to their case (as to those counts) even if an issue remains about invitee status. The burden is on the defendant to demonstrate that no material issue of fact remains as to at least one of these necessary elements. But if the defendant can succeed as to one essential element of the plaintiffs' case, plaintiffs cannot escape summary judgment by pointing to other elements.

■ As a general rule, Illinois does not impose a duty to protect others from criminal attacks by third parties. *Boyd v. Racine Currency Exch.*, 56 Ill.2d 95, 97, 306 N.E.2d 39, 40 (1973); *Gill v. Chicago Park Dist.*, 85 Ill.App.3d 903, 905, 41 Ill.Dec. 173, 175, 407 N.E.2d 671, 673 (1st Dist.1980). However, the Illinois courts have recognized exceptions to this rule where the criminal attack was reasonably foreseeable and the parties had a "special relationship:" (1) carrier-passenger, (2) innkeeper-guest, (3) business invitor-invitee, or (4) voluntary custodian-protectee. *See Rowe v. State Bank of Lombard*, 125 Ill.2d 203, 215–16, 126 Ill.Dec. 519, 525, 531 N.E.2d 1358, 1364 (1988); *Pippin v. Chicago Hous. Auth.*, 78 Ill.2d 204, 208, 35 Ill.Dec. 530, 532, 399 N.E.2d 596, 598 (1979); *Fancil v. Q.S.E.*

carefully and in the light most favorable to the plaintiffs, but we pause to note that the district court was within its rights to require more guidance from the plaintiffs' attorney. The court was not obliged to obtain its own city map and track the incident reports with an eye to determining which of them occurred in the vicinity of the parking lot. Yet without such a calculation the police reports were of little use, for if

they indicated incidents occurring near a different point on campus—perhaps near the bridge—they might actually provide justification for a decision by North Park to patrol those areas in preference to the parking lot. Even while urging us to consider these reports as evidence, plaintiffs' brief on appeal at no point indicated with sufficient specificity why or how we should.)

*Foods, Inc.,* 60 Ill.2d 552, 560, 328 N.E.2d 538, 540 (1975); *Comastro v. Village of Rosemont,* 122 Ill.App.3d 405, 408, 78 Ill. Dec. 32, 35, 461 N.E.2d 616, 619 (1st Dist. 1984); *Burks v. Madyun,* 105 Ill.App.3d 917, 920, 61 Ill.Dec. 696, 699, 435 N.E.2d 185, 188 (1st Dist.1982); *Martin v. Usher,* 55 Ill.App.3d 409, 410, 13 Ill.Dec. 374, 375, 371 N.E.2d 69, 70 (1st Dist.1977); *Trice v. Chicago Hous. Auth.,* 14 Ill.App.3d 97, 99, 302 N.E.2d 207, 208 (1st Dist.1973); *O'Brien v. Colonial Village, Inc.,* 119 Ill. App.2d 105, 106, 255 N.E.2d 205, 207 (1970) (invitee); *see* Restatement (Second) of Torts §§ 314A, 343, 448, 449 (1965).[3]

■ Figueroa claims that North Park owed her a duty under both the "invitee" and "voluntary undertaking" exceptions. Whether or not North Park owed Figueroa a duty is a question of law to be resolved by the court. *Ferentchak v. Village of Frankfort,* 105 Ill.2d 474, 480, 86 Ill.Dec. 443, 447, 475 N.E.2d 822, 825 (1985); *Fancil,* 60 Ill.2d at 555, 328 N.E.2d at 540 (1975); *Cunis v. Brennan,* 56 Ill.2d 372, 374, 308 N.E.2d 617, 618 (1974); *see Rankow v. First Chicago Corp.,* 870 F.2d 356, 359 (7th Cir.1989).

### A.

■ We consider first whether North Park owed Figueroa a duty as an invitee. In 1984 Illinois passed the Premises Liability Act ("Act"), which abolished the common law distinction between invitees and licensees. Ill.Rev.Stat. ch. 80, para. 302 (1985). The Act became effective as of September 12, 1984. The Illinois appellate

courts have since ruled that the Act is not to be applied retroactively. *Cerniglia v. Farris,* 160 Ill.App.3d 568, 575, 113 Ill.Dec. 10, 14, 514 N.E.2d 792, 796 (4th Dist.1987); *Grimwood v. Tabor Grain Co.,* 130 Ill. App.3d 708, 711, 86 Ill.Dec. 6, 8, 474 N.E.2d 920, 922 (3d Dist.1985). Because the events at issue in this case occurred in 1983, the Act is inapplicable.

■ Illinois courts have applied a three-part test in determining whether a person qualifies as a business invitee:

> A person is an invitee if: (1) he enters the premises of another by express or implied invitation; (2) his entry is connected with the owner's business or with an activity the owner conducts or permits to be conducted on his land; *and* (3) there is a mutuality of benefit or a benefit to the owner.

*Grimwood,* 130 Ill.App.3d at 710, 86 Ill. Dec. at 8, 474 N.E.2d at 922 (quoting *Madrazo v. Michaels,* 1 Ill.App.3d 583, 586, 274 N.E.2d 635, 638 (1st Dist.1971)) (emphasis added); *see also Cerniglia,* 160 Ill. App.3d at 576, 113 Ill.Dec. at 14, 514 N.E. 2d at 796. The district court concluded that Figueroa met none of these requirements. Although we find the first two parts of the test somewhat more problematic as applied to Figueroa's case than did the district court, we agree that there is no issue of material fact remaining for trial as to the final requirement (mutuality of benefit). Because this is a necessary element of Figueroa's case, the defendant is entitled to summary judgment as to the plaintiffs' "in-

---

**3.** Section 343 of the Restatement (Second) provides that landowners may be liable to invitees for conditions involving an unreasonable risk of harm; imposition of this provision obviously requires a prior finding of invitee status. Sections 448 and 449 provide that actors whose negligence affords the possibility for criminal or tortious conduct by third parties may be held liable. However, where the likelihood that the third party will act in a criminal way is one of the factors that renders the actor negligent in the first place, the Restatement does not impose liability in the absence of a preexisting duty. Restatement (Second) of Torts § 449, comment a. ("... the mere possibility or even likelihood that there may be such [criminal] mis-

conduct is not in all cases sufficient to characterize the actor's conduct as negligence. It is only where the actor is under a duty to the other, because of some relation between them, to protect him against such misconduct, or where the actor has undertaken the obligation of doing so, or his conduct has created or increased the risk of harm through the misconduct, that he becomes negligent."); *see also Fancil,* 60 Ill.2d at 560, 328 N.E.2d at 540. Illinois courts have considered these factors as a part of the "voluntary undertaking" analysis (as indicated in part by sections 314A and 324A). Thus, an initial calculation whether a duty exists is a necessary prerequisite to imposing liability under any of these sections.

vitee" claims (Counts I and II).[4]

█ In order to qualify as an invitee, Figueroa must first demonstrate that she entered North Park's property by express or implied invitation. The district court correctly notes that mere tolerance or acquiescence cannot under Illinois law constitute an invitation. *Figueroa v. Evangelical Covenant Church*, 698 F.Supp. 1408, 1411 (N.D.Ill.1988). However, the cases dealing with this issue have generally involved silent acquiescence on the part of property owners. In *Grimwood*, for example, the plaintiff was injured while visiting his father's worksite at the Tabor Grain Company. The court concluded that although the plaintiff had repeatedly visited his father at work, the company had not invited the plaintiff to visit his father: "The defendant may have permitted or acquiesced in the plaintiff's prior visits. However, mere tolerance or acquiescence does not constitute an invitation." 130 Ill. App.3d at 711, 86 Ill.Dec. at 8, 474 N.E.2d at 922.[5] In the case before us, North Park did not merely sit silently as parents from the Center used the parking lot. In March of 1982, North Park formally acknowledged the Center's use of the parking lot in a letter to the church that owned the Center building:

> For the past two years North Park College has been pleased to share its parking facilities along Kimball Avenue and north of your church/school property with your current tenants—The Day Care Center and Art Department of Northeastern University.

> To give as much notice as possible we want to put on record the fact that in our Master Plan for Campus Development this parking facility will be converted to other uses and, therefore, not available to the present users.

Defendant's Motion for Summary Judgment, Ex. 7. There is some indication in the record that a North Park official had had prior communications with the pastor of the church about church use of the parking lot. *Id.* Ex. 6 at 51. It is not clear what kind of prior communication any official of the school had had with the church or the Center about the Center's use of the parking lot, but the issue is at least minimally raised by the testimony of one school official that an informal arrangement had been in place for some time before 1980. *Id.* at 5, 52.

The oral and written communications from North Park go considerably beyond the mere absence of objection usually characterizing "acquiescence." Yet the Illinois cases in which plaintiffs were found to be invitees generally have involved a more clearcut invitor-invitee relationship—as, for example, between stores or restaurants and their customers, *see Wilson v. Clark Oil & Refining Corp.*, 134 Ill.App.3d 1084, 90 Ill.Dec. 40, 481 N.E.2d 840 (5th Dist. 1985); *Yangas v. Charlie Club, Inc.*, 113 Ill.App.3d 398, 69 Ill.Dec. 267, 447 N.E.2d 484 (3d Dist.1983), or concert organizers and attendees, *see Comastro v. Village of Rosemont*, 122 Ill.App.3d 405, 78 Ill.Dec. 32, 461 N.E.2d 616 (1st Dist.1984). Because this issue is not clearcut—and because some factfinding as to a disputed fact might be required (i.e., whether North Park officials communicated an oral invitation to church or Center representatives)—we would be reluctant to permit summary judgment were our decision to depend upon this issue alone.

Similarly, there is some question as to the second element of the "invitee" test, which requires that entry be "connected with the owner's business or with an activity the owner conducts or permits to be conducted on his land." *Grimwood*, 130

---

**4.** Even if Figueroa could qualify as an "invitee," she would have to demonstrate that the harm here was reasonably foreseeable, another requirement as to which plaintiffs have failed to meet their threshold burden (*see infra* II.B.).

**5.** Illinois courts have also analyzed acquiescence when attempting to distinguish trespassers from licensees. Discussions of acquiescence in these cases have similarly focused on situations in which the landowner took no action and failed to communicate with the person coming onto his or her property. *See Mentesana v. LaFranco*, 73 Ill.App.3d 204, 29 Ill.Dec. 153, 391 N.E.2d 416 (1st Dist.1979); *Trout v. Bank of Belleville*, 36 Ill.App.3d 83, 343 N.E.2d 261 (5th Dist.1976).

Ill.App.3d at 710, 86 Ill.Dec. at 8, 474 N.E. 2d at 922; *Cerniglia,* 160 Ill.App.3d at 576, 113 Ill.Dec. at 14, 514 N.E.2d at 796; *see also Augsburger v. Singer,* 103 Ill.App.2d 12, 242 N.E.2d 436 (2d Dist.1968); *Drews v. Mason,* 29 Ill.App.2d 269, 172 N.E.2d 383 (3d Dist.1961); *Bogovich v. Schermer,* 16 Ill.App.2d 197, 147 N.E.2d 711 (4th Dist. 1958). Although parking for Center customers was clearly not "connected with" North Park's business, it is not entirely obvious that parking was not an activity that North Park allowed "to be conducted on [its] land."

▇ However, Figueroa must also have adduced some minimal support for her contention that she can satisfy the third element of the "invitee" test—mutuality of benefit or benefit to North Park. This is the criterion upon which Illinois courts have relied most consistently in determining invitee status, even before the more modern three-part test was articulated.[6] *See Ellguth v. Blackstone Hotel, Inc.,* 408 Ill. 343, 347–49, 97 N.E.2d 290, 293 (1951); *Pauckner v. Wakem,* 231 Ill. 276, 280–81, 83 N.E. 202, 204 (1907); *Trout v. Bank of Belleville,* 36 Ill.App.3d 83, 87, 343 N.E.2d 261, 264 (5th Dist.1976); *Gonzalez v. Batelli,* 19 Ill.App.3d 278, 283, 311 N.E.2d 348, 351 (1st Dist.1974). Figueroa claims that North Park derived a "public relations benefit" from permitting Center parents to use its parking lot. Brief of Appellant at 15. Without more substantiation, this vague allegation does not suffice to indicate the kind of ascertainable benefit generally required in order to confer invitee status. *See Grimwood,* 130 Ill.App.3d at 711, 86 Ill.Dec. at 8, 474 N.E.2d at 922 (3d Dist. 1985); *Gonzalez,* 19 Ill.App.3d at 283, 311 N.E.2d at 351. Figueroa further argues that the climate of good will created by allowing use of the lot gave North Park a "favorable negotiating position" in attempts to purchase the Center building from the church that leased it to the Center. *Id.* Again we can find nothing in the record to provide any support for this claim. North Park did negotiate with the

pastor of the church to purchase the building, but there is no suggestion that the parking lot situation figured at all in these negotiations or their outcome. We conclude that if there was any benefit to North Park "it was simply too remote to confer invitee status upon the plaintiff." *Grimwood,* 130 Ill.App.3d at 711, 86 Ill. Dec. at 8, 474 N.E.2d at 922 (3d Dist.1985).

**B.**

The remaining counts charge North Park with negligence under two alternate versions of the "voluntary undertaking" theory. In Counts III and IV the plaintiffs allege that North Park's Security Department and its procedures increased the risk of danger to Figueroa. Counts V and VI delete allegations of increased risk based upon the Illinois Supreme Court's holding in *Phillips v. Chicago Housing Auth.,* 89 Ill.2d 122, 122, 59 Ill.Dec. 281, 283, 431 N.E.2d 1038, 1040 (1982) that "no such allegation is necessary."

Illinois courts have apparently taken two different approaches to imposing liability under the voluntary undertaking exception. The difference is perhaps best illuminated in *Pippin v. Chicago Hous. Auth.,* 78 Ill.2d 204, 35 Ill.Dec. 530, 399 N.E.2d 596 (1979), in which the Illinois Supreme Court utilized both approaches in analyzing the liability of two different defendants. In *Pippin,* a tenant of the Chicago Housing Authority ("CHA") stabbed a social guest while in a CHA building lobby. The victim died as a result of this attack. The decedent's mother sued both the CHA and the CHA's guard service, Interstate Service Corporation ("Interstate"). The Illinois Supreme Court's analysis of the CHA's liability relied upon an earlier case, *Nelson v. Union Wire Rope Corp.,* 31 Ill.2d 69, 199 N.E.2d 769 (1964):

> In *Nelson v. Union Wire Rope Corp.,* ... this court gave its recognition to the established principle that liability can arise from the negligent performance of

6. Although earlier cases often required that the benefit be an economic one, the trend for some time has been away from requiring a strictly

economic benefit. *See Madrazo,* 1 Ill.App.3d at 587, 274 N.E.2d at 638; *see also* W. Prosser, The Law of Torts § 61, at 388–89 (4th ed. 1971).

a voluntary undertaking. The court utilized this principle to impose liability against an insurer for personal injuries suffered as a result of the insurer's negligent performance of a gratuitous inspection of the premises where the injuries occurred.

*Pippin,* 78 Ill.2d at 209, 35 Ill.Dec. at 533, 399 N.E.2d at 599 (citation omitted). In analyzing the CHA's duty to Pippin, the supreme court took a very narrow view of the scope of the duty owed (limiting it quite strictly to the extent of the CHA's undertaking), but did not require that the CHA's actions increase the risk to Pippin before liability could be imposed. *Accord Phillips,* 89 Ill.2d at 127, 59 Ill.Dec. at 284, 431 N.E.2d at 1041 ("Under the *Pippin* holding, no such allegation [of increased risk] is necessary."). By contrast, the court in *Pippin* analyzed the liability of the guard service hired by the CHA under section 324A of the Restatement (Second) of Torts ("Liability to Third Persons for Negligent Performance of Undertaking"), which requires a showing of increased risk, preexisting duty or reliance. *See Hylin v. United States,* 715 F.2d 1206 (7th Cir.1983) (increased risk, preexisting duty *or* reliance suffice to trigger section 324A). Because the CHA had clearly relied upon Interstate to provide guard services, the supreme court ruled that the claim against Interstate survived for trial. *Pippin,* 78 Ill.2d at 211–12, 35 Ill.Dec. at 534, 399 N.E.2d at 600. *See also Rowe,* 125 Ill.2d 203, 126 Ill.Dec. 519, 531 N.E.2d 1358 (1988) (no duty owed by landlord directly to tenant under section 324A; however, landlord who retained control over security devices had duty to use ordinary care in maintaining them).[7]

This difference in approach is hardly surprising, because section 324A specifically deals with "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things...." Restatement (Second) of Torts § 324A (1965). This provision was applicable to the *guard service* in *Pippin* because the service undertook to render services *for the CHA* that were obviously for the protection of third parties, here the CHA's tenants and their guests.[8] *See also Scott & Fetzer Co. v. Montgomery Ward & Co.,* 112 Ill.2d 378, 98 Ill.Dec. 1, 493 N.E.2d 1022 (1986) (section 324A applicable where store relied on security services company to provide fire-warning systems for protection of other tenants); *Eichler v. Plitt Theatres, Inc.,* 167 Ill.App.3d 685, 118 Ill.Dec. 503, 521 N.E.2d 1196 (2d Dist.1988) (section 324A applicable where parking lot owner relied on owner of adjacent theatre to remove snow and ice for protection of third persons coming onto property). Section 324A was not applicable to the CHA in *Pippin,* because the CHA had not undertaken to provide tenants or guests protection *on behalf of another party.* Rather, the issue was whether the CHA itself owed a duty directly to its tenants and guests. In this case North Park had its own security department; hence there is no separate guard service for Figueroa to sue. The relation-

7. There is a tendency to analyze Illinois landlord-tenant cases under the "voluntary undertaking" doctrine because the landlord-tenant relation cannot be otherwise described as a "special relationship" under Illinois law; for this reason, many of the Illinois voluntary undertaking cases involve landlords and tenants. A number of these cases have been ultimately decided on bases peculiar to the landlord-tenant relationship (as, for example, the landlord's duty to keep common areas of the building or areas under his or her control reasonably safe), and thus do not give much guidance in the case before us. *See, e.g., Rowe,* 125 Ill.2d at 203, 126 Ill.Dec. at 519, 531 N.E.2d at 1358; *Duncavage v. Allen,* 147 Ill.App.3d 88, 100 Ill.Dec. 455, 497 N.E.2d 433 (1st Dist.1986).

8. Some confusion arises because of the use of the term "third person" in two different contexts; section 324A speaks of protection *owed to* a third person, while section 448 (and the cases dealing with criminal acts by third parties) speak of a duty to protect *from* criminal acts of third parties. When section 324A is applied to situations in which a duty of protection from criminal acts is owed to a third person, there are of course four parties involved (the party assuming a duty to provide protection, the party from whom that duty is assumed, the party to whom the duty is owed and the party performing the criminal act). Section 324A is not triggered when only one protector, a protectee and a criminal are involved.

ship alleged in this case, a duty owed directly by North Park to Figueroa, is more appropriately dealt with under the *Nelson* analysis used by the supreme court in *Pippin* to determine the CHA's own duty to its tenants.

The doctrine adopted from *Nelson* by the supreme court has its roots in the original Restatement of Torts, which provides:

> (1) One who gratuitously renders services to another, otherwise than by taking charge of him when helpless, is subject to liability for bodily harm caused to the other by his failure, while so doing, to exercise with reasonable care such competence and skill as he possesses.

Restatement of Torts § 323(1) (1934), quoted in part in *Nelson*, 31 Ill.2d at 74, 199 N.E.2d at 779. In *Nelson*, the Illinois Supreme Court imposed liability on an insurance company for negligence in carrying out gratuitously undertaken safety inspections. The court specifically declined to require reliance in order to impose liability for a negligently-performed action of this kind (as opposed to a failure to act or nonfeasance, for which reliance was required under section 325 of the Restatement):

> We think it clear under the law that defendant's liability for the negligent performance of its undertaking, as distinguished from a failure to perform, is not limited to such persons as might have relied upon it to act but extends instead to such persons as defendant could reasonably have foreseen would be endangered as the result of negligent performance.... [S]uch duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons.

*Nelson*, 31 Ill.2d at 86, 199 N.E.2d at 779. *See also Cincinnati Ins. Co. v. City of Taylorville*, 818 F.2d 1345 (7th Cir.1987) (no "voluntary undertaking" where city

fails to provide fire protection to party to whom such protection is not owed).

Although the second Restatement subsequently altered the provisions of sections 323 and 325, the Illinois Supreme Court in *Pippin* simply adopted the *Nelson* rationale, which was derived from the first Restatement.[9] Thus, while the second Restatement would require either a showing of increased risk or of reliance, Illinois has not to date adopted the reasoning of section 323 of the newer Restatement. Indeed, in *Phillips*, the supreme court explicitly refused to require a showing of increased risk before imposing liability on the CHA for a criminal attack upon one of its tenants, citing *Nelson* and *Pippin. Phillips*, 89 Ill.2d at 127–29, 59 Ill.Dec. at 284, 431 N.E.2d at 1041. In *Phillips* the court held that the plaintiff's complaint stated a cause of action when it alleged that the CHA had negligently performed a voluntarily undertaken duty to close off and secure certain unoccupied floors (in an effort to prevent crimes and safeguard tenants). *Id.* at 126, 59 Ill.Dec. at 283, 431 N.E.2d at 1040.

■ Although *Pippin* and *Phillips* clearly do not require a showing of reliance or of increased risk in order to meet the "voluntary undertaking" exception, they do require that any duty assumed be limited strictly to the scope of the undertaking— and they follow *Nelson* (and many other voluntary undertaking cases) in requiring that the injury sustained be reasonably foreseeable. In a sense, these two requirements are simply different expressions of the same policy, because whether or not a duty to protect against a particular injury falls within the scope of the actor's undertaking depends in large part upon whether that injury was a reasonably foreseeable consequence of the actor's negligent performance of the duty originally undertaken.

9. The second Restatement collapses section 325 into section 323, which as amended reads:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts, § 323 (1965). The old distinction between misfeasance and nonfeasance has apparently been abolished.

We must therefore begin by inquiring whether North Park voluntarily undertook a duty to protect Center patrons such as Figueroa, and, if so, whether protection against attacks such as the one involved in this case fell within the scope of any duty assumed.  The district court, based on almost unanimous testimony by North Park security officers to that effect, concluded that North Park had gratuitously undertaken to provide protection for all persons lawfully on the premises.  For purposes of this summary judgment motion, where all inferences are to be drawn in favor of the nonmovant, the court's conclusion was clearly correct.  In a somewhat puzzling attempt to cast doubt upon the district court's approach, plaintiffs urge that even this conclusion, drawn as favorably as possible to their case, was incorrect.  Plaintiffs maintain that a material issue of fact remains in dispute, pointing to the testimony of the director of security at North Park, Harry Tannehill, who said that the purpose of the security department was "protection of the students, staff, protection of property on campus.  Visible patrol."  Defendant's Motion for Summary Judgment, Ex. 6.  In the plaintiffs' view, this conflicts with testimony from a number of North Park security officers who testified that the security department also protected other persons lawfully on campus.  Plaintiffs' Memo. in Opp., Ex. 18 (duty was "as possible, to protect the people on the college campus"); Ex. 19 (duty was "to take proper police action" in case of criminal activity on campus); Ex. 20 (duty extended to persons on campus other than North Park students or personnel); Ex. 21 (duty was to stop crime taking place "no matter who the person was"); Ex. 23 (duty to provide security extended to any persons coming on the campus); Ex. 24 (protection extended to "any persons that are on the grounds, whether they're students or faculty or whether they're citizens just walking through the grounds"); Ex. 25 (security provided for any "authorized visitor" or "guest").  The North Park official in charge of all non-academic affairs (including the security department) also testified that protection extended to any people "legitimately on the campus."  Id. at Ex. 17.

A careful reading of all the depositions reveals that there is no conflict.  A number of the security officers, when first asked about the purpose of the security department, replied that its purpose was to protect the students and staff of the College.  See id. at Exs. 21, 23, 24, 25.  However, when subsequently asked whether protection also extended to people on campus who were not members of the College community, these same officers replied that it did.  There is no necessary conflict between asserting, on the one hand, that the primary purpose of a college security department is protection of college personnel, and on the other, that the protection afforded by this department extended to others.[10]  Tannehill did not deny that protection extended to others, and so his testimony was not in conflict with that of other officers.  No material issue of fact remains that would require remand to a jury.  The district

10. We are not faced with the difficult case in which a protector with limited resources might have to choose, in deploying safety personnel, between the people for whom the protective service was primarily designed (here, faculty, staff and students) and those to whom it was secondarily extended (here, other persons lawfully on campus).  Had North Park had notice of highly dangerous situations occurring in two different locations—one of which was primarily frequented by students and the other primarily by Center staff and parents—then we might be faced with the difficult policy issue whether this difference between "primary" and "secondary" beneficiaries should matter in determining the extent of the duty undertaken.  However, North Park had no notice of serious problems in the area of the parking lot, and there is no reason to believe that North Park personnel did not also frequent the area of the parking lot.  Thus we do not reach the issue whether the difference articulated by the security guards between their primary goal (protection of North Park students and personnel) and their extended duty (protection of anyone lawfully on the premises) should affect the outcome here.  Plaintiffs also contend that the assailants were present in the parking lot for up to an hour before the assault, thereby putting North Park on notice of the potential danger to Figueroa.  In the absence of any history of serious problems in the parking lot, North Park had no duty to patrol the area on an hourly or semi-hourly basis; hence whether the assailants were present for an hour before the attack is essentially irrelevant to the foreseeability analysis here.

court correctly concluded, drawing inferences in the Figueroas' favor, that North Park had undertaken a duty to protect those lawfully on campus.

■ The next issue, then, is whether the scope of the duty undertaken by North Park extended to the kind of crime involved in this case. The Illinois Supreme Court in *Pippin* carefully constricted the scope of duties voluntarily assumed, limiting the CHA's liability in that case to any demonstrable negligence in its *hiring* of the security service (as that was the extent of the CHA's undertaking). 78 Ill.2d at 210, 35 Ill.Dec. at 533, 399 N.E.2d at 599; *see also Homer v. Pabst Brewing Co.,* 806 F.2d 119, 122 (7th Cir.1986) (following Illinois courts' "restrictive view" of "duty associated with voluntary undertakings"). Subsequent Illinois appellate court decisions have taken a similarly restrictive view of the scope of voluntarily assumed duties. *See, e.g., Rabel v. Illinois Wesleyan Univ.,* 161 Ill.App. 3d 348, 112 Ill.Dec. 889, 514 N.E.2d 552 (4th Dist.1987) (no duty to protect plaintiff from injury due to prank at fraternity party where plaintiff fails to allege that university undertook to provide protection or security services, but alleges only that it equipped buildings with security devices and provided security personnel); *McColgan v. United Mine Workers of America,* 124 Ill.App.3d 825, 80 Ill.Dec. 183, 464 N.E. 2d 1166 (1st Dist.1984) (union did not undertake duty to monitor safety conditions in mine); *Carrigan v. New World Enters., Ltd.,* 112 Ill.App.3d 970, 68 Ill.Dec. 531, 446 N.E.2d 265 (3d Dist.1983) (landlord who undertook to provide burglar alarm, but never promised protection from crime, had

duty only to keep burglar alarm operable). Illinois courts have frequently warned that voluntarily undertaking "to provide some measure of police protection does not make [a party] an insurer for the safety of persons" entering the property. *Kraustrunk v. Chicago Hous. Auth.,* 95 Ill.App.3d 529, 532, 51 Ill.Dec. 15, 17, 420 N.E.2d 429, 431 (1st Dist.1981); *see also Stelloh v. Cottage 83,* 52 Ill.App.2d 168, 171, 201 N.E.2d 672, 673 (1st Dist.1964).[11]

■ On the other hand, North Park did not merely undertake to repair a burglar alarm or hire a security agency; nor did it undertake only to provide protection as to one particular part of the campus. And where a more general duty to provide security is involved, Illinois courts have not hesitated to impose liability when negligently-performed security measures failed to prevent crime. *See Phillips v. Chicago Hous. Auth.,* 89 Ill.2d 122, 59 Ill.Dec. 281, 431 N.E.2d 1038 (1982); *Cross v. Wells Fargo Alarm Servs.,* 82 Ill.2d 313, 45 Ill. Dec. 121, 412 N.E.2d 472 (1980); *Pippin v. Chicago Hous. Auth.,* 78 Ill.2d 204, 35 Ill. Dec. 530, 399 N.E.2d 596 (1979); *Neering v. Illinois Cent. R.R. Co.,* 383 Ill. 366, 50 N.E.2d 497 (1943); *Comastro v. Village of Rosemont,* 122 Ill.App.3d 405, 78 Ill.Dec. 32, 461 N.E.2d 616 (1st Dist.1984). Once North Park voluntarily provided security services for people lawfully on campus, it became subject to liability for injuries resulting from some kinds of crimes. In determining to what kinds of crimes North Park's duty of protection extended, we must ask what kind of crimes were reasonably foreseeable at the time North Park undertook to provide protection.[12] *See*

---

**11.** Although not directly on point, the cases dealing with police officers' potential liability under section 324A evince a similar recognition of the difficulties inherent in imposing upon those who undertake to provide security protection an absolute duty to protect from all possible harm:

The general rule [declining to impose such a duty] arises from an understanding that it is difficult to prevent crime and it is still more difficult to prove whether a crime could have been prevented.... In sum, the general trend of Illinois courts is against a liberal interpretation of the exceptions to the general rule of police non-liability for failure to prevent crime....

*LeRose v. City of Zion/Police Dep't,* 696 F.Supp. 1222, 1227–28 (N.D.Ill.1988). *See also Fessler by Fessler v. R.E.J., Inc.,* 161 Ill.App.3d 290, 112 Ill.Dec. 852, 514 N.E.2d 515 (4th Dist.1987); *Santy v. Bresee,* 129 Ill.App.3d 658, 84 Ill.Dec. 853, 473 N.E.2d 69 (4th Dist.1984); *Marvin v. Chicago Transit Auth.,* 113 Ill.App.3d 172, 68 Ill.Dec. 786, 446 N.E.2d 1183 (1st Dist.1983). These cases also indicate that any duty imposed as a result of a voluntary undertaking to provide security or police protection should be narrowly tailored to the scope of the undertaking.

**12.** Even if an injury is foreseeable, Illinois imposes a further restriction:

It is important to recognize that the imposition of a duty is an exercise of judicial policy

**1438**

*Cunis,* 56 Ill.2d at 375–76, 308 N.E.2d at 619 ("... in determining whether there was a legal duty, the occurrence involved must not have been simply foreseeable, ... it must have been reasonably foreseeable. The creation of a legal duty requires more than a mere possibility of occurrence.").

The "foreseeability" requirement is clearly stated in *Nelson,* in which the Illinois Supreme Court imposed a duty "to guard against injury which naturally flows as a reasonably probable and foreseeable consequence" of a negligently-performed act. 31 Ill.2d at 86, 199 N.E.2d at 779. In *Yangas v. Charlie Club,* 113 Ill.App.3d 398, 69 Ill.Dec. 267, 447 N.E.2d 484 (3d Dist.1983), the Appellate Court of Illinois refused to impose liability on a tavern keeper (the Charlie Club) that had turned an intoxicated man away, when that man subsequently ran his car into a guest departing the Club. The court reasoned that the Club was not "aware of any violent or dangerous conduct by Palmer, nor aware that he was intoxicated to the point of not being in control of himself." *Id.* at 404, 69 Ill.Dec. at 281, 447 N.E.2d at 488. Similarly, in *Getson v. Edifice Lounge, Inc.,* 117 Ill.App.3d 707, 72 Ill.Dec. 826, 453 N.E.2d 131 (3d Dist.1983), the court dismissed the plaintiffs' argument that the presence of a knife-carrying motorcycle gang member in a bar made subsequent injuries reasonably foreseeable to the bar owner. The court asserted that "there was simply no evidence prior to the attack" to put the bar owner on notice that a particular gang member "was likely to cause harm and injury." *Id.* at 713, 72 Ill.Dec. at 830, 453 N.E.2d at 135. In *Taylor v. Hocker,* 101 Ill.App.3d 639, 57 Ill.Dec. 112, 428 N.E.2d 662 (5th Dist.1981), a case closely resembling the one before us, the court refused

to impose a duty on a shopping mall owner to protect plaintiffs from attack in its parking lot, because no similar violent crimes had ever occurred on the premises. When a spectator at a football game was attacked, the appellate court ruled that the attack was not reasonably foreseeable because "there were no disruptions or acts of violence at Soldier Field on the day of the incident, and ... there was no warning of any sort ... [or] evidence of prior incidents of violence that would give notice to defendants of the probability of such assaults." *Gill v. Chicago Park Dist.,* 85 Ill.App.3d 903, 906, 41 Ill.Dec. 173, 175, 407 N.E.2d 671, 673 (1st Dist.1980). *Accord Barmore v. Elmore,* 83 Ill.App.3d 1056, 38 Ill.Dec. 751, 403 N.E.2d 1355 (2d Dist.1980) (parents of mental health patient could not reasonably foresee son's criminal attack on houseguest because ten years had elapsed since any previous attacks); *Applebaum v. Jewel Cos., Inc.,* 76 Ill.App.3d 346, 348, 32 Ill.Dec. 110, 112, 395 N.E.2d 57, 59 (1st Dist.1979) (store would not be held liable for injuries ensuing from scuffle between shoppers "absent knowledge of previous incidents ... from which such acts could be anticipated"); *O'Brien,* 119 Ill.App.2d at 108, 255 N.E.2d at 207 (owners and operators of shopping center owed no duty to protect patron from assault in parking lot "absent knowledge of previous incidents or special circumstances which would charge the owner with knowledge of the dangers and the duty to anticipate it").

Plaintiffs have not come forward with any evidence to suggest that an attack remotely resembling the one in this case had occurred anywhere on North Park property, let alone in the campus area around the parking lot, prior to the attack

---

making.... "In determining whether the law imposes a duty, foreseeability of possible harm alone is not the test, for in retrospect almost every occurrence may appear to be foreseeable. The likelihood of injury from the existence of the condition, the magnitude of guarding against it, and the consequences of placing the burden upon the defendant must be taken into account."
*McColgan,* 124 Ill.App.3d at 829, 80 Ill.Dec. at 186, 464 N.E.2d at 1169 (citations omitted) (quoting *Barnes v. Washington,* 56 Ill.2d 22, 29,

305 N.E.2d 535, 539 (1973)); *see also Boyd,* 56 Ill.2d at 98–100, 306 N.E.2d at 41–42; *Lance v. Senior,* 36 Ill.2d 516, 224 N.E.2d 231 (1967). Because we conclude that the attack on Figueroa was not reasonably foreseeable, we do not consider whether this further restriction would bar liability. (And, of course, even were we to determine that North Park was under a duty to protect Figueroa from an attack of this kind, she would then have to demonstrate breach of that duty at trial.)

on Figueroa. (There was evidence of an abduction after Figueroa's attack, but that obviously does not demonstrate foreseeability of the prior attack.) We reach this conclusion only after careful examination of all of the documents submitted (including the police reports, *but see supra* note 2). The most serious alleged incidents occurring before the time of the attack on Figueroa involved high school students "harassing" female students around the bridge area of campus. *See, e.g.,* Plaintiffs' Memo. in Opp. Ex. 13. Plaintiffs argue that North Park was negligent in directing officers to concentrate on the area around the bridge (as opposed to that around the parking lot) at certain times, but the only potentially dangerous incidents of which North Park was on notice occurred in the bridge area. North Park responded by taking additional precautions to prevent reasonably foreseeable harm. Vague allegations of · "crimes against persons" at unspecified times and in unspecified places about which witnesses can remember no details do not raise an issue of material fact as to foreseeability. An incident of similar severity was unlikely to have gone undocumented by the police, but none of the police reports from that time period contain evidence of attacks of a similar nature on North Park property putting North Park on notice of potential danger in the area of the parking lot. Because no issue of material fact as to foreseeability remains for trial, North Park is entitled to summary judgment on the "voluntary assumption" claims.

### III.

Because no material issues of fact remain either as to Figueroa's invitee status or as to North Park's voluntary assumption of a duty to protect from the kind of attack involved in this case, the judgment of the district court is

AFFIRMED