Ralph E. GAINES, Plaintiff,

v.

ILLINOIS CENTRAL RAILROAD COMPANY, Defendant/Third–Party Plaintiff–Appellant,

v.

TABOR GRAIN COMPANY, Third–Party Defendant–Appellee.

No. 93–1822.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 6, 1994.

Decided May 5, 1994.

Rehearing Denied July 25, 1994.

Hugh C. Griffin (argued), William T. Weaver, Thomas J. Healey and Sandra K. Macauley, Lord, Bissell & Brook, Chicago, IL, for defendant-appellant.

John J. O'Malley (argued), Seyfarth, Shaw, Fairweather & Geraldson and Gregory W. Beihl, Pope, Ballard, Shepard & Fowle, Chicago, IL, for defendant-appellee.

Before CUDAHY, COFFEY, and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

At about 4:00 a.m. one moonless December night, an Illinois Central train arrived at the Tabor Grain Company in Farmer City, Illi-

nois. The train derailed while trying to access the sidetracks to the grain elevators, and Ralph Gaines, a switchman on the train crew, was thrown or plunged into the night. He sued Illinois Central under the Federal Employers Liability Act, 45 U.S.C. § 51, *et seq.* Illinois Central sued Tabor Grain for contribution, contractual indemnity and implied indemnity (Tabor Grain and Illinois Central had a sidetrack agreement with an indemnification clause). The district court granted summary judgment for Tabor Grain on the contract claim, finding that the agreement did not apply to this accident, and dismissed the implied indemnity claim. Gaines added Tabor Grain as a defendant, and then on the eve of trial settled with both defendants for $303,504.39. Illinois Central paid, and went to trial seeking contribution from Tabor Grain. The jury managed to conclude that Tabor Grain was 16% liable—$48,560.70—for Gaines' injuries. But the judge granted Tabor Grain's motion for judgment as a matter of law. Illinois Central appeals the grant of j.n.o.v. and the summary judgment on the contract claim, 796 F.Supp. 313.

The train crew that Illinois Central dispatched that night had never been to Tabor Grain before and was unfamiliar with the sidetrack layout. But they were assured that Illinois Central's assistant trainmaster Wally Sieruga—who had just been transferred to the Champaign office and had also never been to Tabor Grain—would meet them at Tabor Grain to guide them. Illinois Central had also notified Doug Halcomb, Tabor Grain's plant manager, that an inexperienced crew was coming in that night. The train was to leave 60 empty hopper cars at different locations on the Tabor Grain sidetracks; although an experienced crew would have known where to spot the cars on the Tabor Grain property, Halcomb decided to meet the green crew to ensure the cars were left in the proper places.

The trackage in the area consisted of three east-west roughly parallel lines running to the north of Tabor Grain's grain elevator. Illinois Central owned the main line and a parallel passing track just to its south. The passing track could be accessed from the main line far west of Tabor Grain. In front of Tabor Grain, the passing track had a switch to send a train on the passing track back onto the main line; the passing track otherwise led eastward to an abandoned spur that had been paved over. Tabor Grain owned a roughly parallel third track to the south of the others, accessed by a switch on the passing track about 800 feet west of the grain elevators. Were everything going right, a train coming from the west would have left the main track and entered the passing track, then passed through the switch west of the grain elevators to the Tabor Grain sidetrack.

Sieruga and Halcomb met at Tabor Grain and parked their automobile a few feet south of the Tabor Grain sidetrack, looking perpendicularly at the three parallel tracks to the north. The train arrived, visible to Halcomb only as an outline against the night. Gaines left the train and met with Sieruga and Halcomb in their automobile, where Sieruga gave him a roughly drawn map of the Tabor Grain track layout. The map indicated where the train should drop off the empty cars on the Tabor Grain property. But it did not show that there was both a passing track and a Tabor Grain-owned track; rather, it showed only one sidetrack, identified as the Tabor Grain sidetrack, as well as the other Tabor Grain internal tracks.

Halcomb told Gaines that the switch to gain access to the Tabor Grain tracks from the passing track lay to the west of the automobile. Gaines walked into the darkness about 50–150 feet to the west and encountered a switch. This happened to be the switch on the passing track leading to the abandoned spur; the switch to access the Tabor Grain-owned tracks was several hundred feet further west. Gaines found the switch (leading to the spur) spiked, indicating that it should not be opened; hence he radioed Sieruga and Halcomb for instructions. Sieruga apparently assumed that Gaines was at the switch to the Tabor Grain tracks. Halcomb knew that no Tabor Grain switch was spiked, and told Sieruga he didn't know why the switch would be spiked. Although it was Illinois Central policy not to remove spikes before ascertaining the reason for the

spike, Sieruga told Gaines to throw the switch. Further on, Gaines encountered a derail device and a red signal, all of which were intended to keep trains from going down the abandoned spur. He radioed back to Sieruga; Sieruga told him to remove the derail device and ignore the red signal; Halcomb said nothing.

The train began to move east, already on the passing track. It was supposed to go through the Tabor Grain switch and come in just a few feet in front of Halcomb and Sieruga's automobile. In fact, it had already missed the Tabor Grain switch and was proceeding along the passing track, toward the now-open switch to the abandoned spur. Halcomb asked Sieruga what the train was doing; he testified that Sieruga replied that the crew was probably rearranging the cars to get them ready to pull into the plant (trains sometimes went back and forth along the main and passing tracks to make adjustments). But Gaines then radioed from the train that something was wrong, and Halcomb and Sieruga turned and drove east towards the front of the train. In the headlights, Halcomb saw the train illuminated against an abandoned depot and he realized it had passed the switch onto the abandoned spur rather than heading into Tabor Grain's trackage or back onto the main line. The train hit the pavement, which had been laid over the spur, and derailed.

The jury was instructed that Illinois Central considered Tabor Grain negligent because Halcomb failed to warn the train crew that it was moving on the wrong track, and failed to ascertain that the train was going onto the abandoned spur. The jury found Tabor Grain 16% liable, but the district court granted Tabor Grain's motion for j.n.o.v., finding that there was no evidence that Halcomb breached a duty to Gaines. We review the district court's determination de novo, and affirm if the evidence, viewed most favorably to Illinois Central, is insufficient to support the verdict. *Tapia v. Greenwood,* 965 F.2d 336, 338 (7th Cir.1992).

Illinois has a "good Samaritan" rule whereby one who voluntarily undertakes a task must exercise care and skill in its performance. *Cincinnati Ins. Co. v. City of Taylorville,* 818 F.2d 1345, 1348 (7th Cir. 1987); *Triolo v. Frisella,* 3 Ill.App.2d 200, 121 N.E.2d 49 (1954). But before we can assess whether Halcomb exercised reasonable care, we must determine the scope of the duty he assumed. Tabor Grain contends that Halcomb was present that night only to show the Illinois Central crew where to spot the empty cars on the Tabor Grain property; if he exercised proper care in that task, he was not at fault. Illinois Central, however, points to Halcomb's testimony that he told Gaines, when the three were sitting in the car looking at the map, about "the track layout at Tabor Grain and ... *how to access our trackage* " (emphasis supplied). Illinois Central argues that Halcomb thus assumed a duty to guide the train from the main line onto the Tabor Grain property. The district court did not explicitly determine the scope of the duty Halcomb assumed, but apparently applied a much weaker version of Illinois Central's formulation. It is clear that Halcomb undertook a duty to show the train crew where to spot the cars, for he pointed out each of the locations on the map; it is also clear that he undertook a duty to show the train crew the switch from Illinois Central's tracks onto the Tabor Grain sidetrack, for he told Gaines where to find the Tabor switch. But there was no evidence to support Illinois Central's broad contention that Halcomb undertook to tell the Illinois Central crew how to navigate Illinois Central tracks, how to throw Illinois Central switches or whether to remove Illinois Central spikes and derail devices (potentially in violation of Illinois Central policies). A duty assumed because of a voluntary undertaking must be strictly limited to the scope of that undertaking, *Figueroa v. Evangelical Covenant Church,* 879 F.2d 1427, 1435 (7th Cir.1989); there is no evidence here that Halcomb agreed to guide the Illinois Central crew on its own tracks.

Halcomb fulfilled his duty to help the train access the Tabor Grain tracks by reviewing the map with Gaines and pointing him to the Tabor Grain switch. Illinois Central argues that Halcomb should have realized that the map did not accurately depict all of the tracks in the area, including the abandoned

spur. But the map—a very rough drawing—accurately depicted all of the Tabor Grain sidetracks. It was only sketchy as to the Illinois Central tracks, which were Sieruga's, not Halcomb's, province. The spiked switch, the derail device and the red signal were all part of the Illinois Central track system. Tabor Grain also adduced no evidence that Halcomb knew when he sent Gaines west to open the Tabor Grain switch that other Illinois Central switches lay in the vicinity.

Moreover, although Halcomb had agreed to help the train access the Tabor Grain sidetracks, he did not assume responsibility for the train's entire approach. Thus there was no reason he should have ascertained or warned the crew that the train was moving along the passing track rather than the Tabor Grain track. In fact, when he sensed that the train was moving along the passing track, he asked Sieruga for an explanation. He testified that Sieruga explained that the crew was probably re-arranging the cars—a sensible explanation that would not give rise to concern. Moreover, although Halcomb knew the layout of the tracks, there was no evidence that he could have seen through the dark that the train was moving onto the abandoned spur rather than the out onto the main track.

Halcomb agreed to a somewhat limited undertaking—helping the train get from its own track onto the Tabor Grain tracks. He did not agree to, and never attempted to, explain to Illinois Central the layout of its own tracks. Nor did he undertake to direct or monitor the train's movements along its own tracks. There was no evidence to indicate that he failed to exercise reasonable care in the performance of any of the duties he assumed. We therefore agree that the district court properly granted Tabor Grain's motion for j.n.o.v.

Illinois Central also appeals from the district court's order granting summary judgment on its contract claim. But since we affirm the district court's grant of j.n.o.v., we do not need to consider the issue. The sidetrack agreement provided that "if any claim or liability other than from fires shall arise from the joint or concurring negligence of both parties hereto, it shall be borne by them equally." But we have held that Tabor Grain is not negligent as a matter of law. Since the contract does not apply here, we affirm the district court's finding of summary judgment on the contract claim as well. The decisions of the district court are therefore AFFIRMED.